441 F.2d 1204
 Fed. Sec. L. Rep. P 93,022
UNITED STATES of America, Appellee,
v.
Sidney E. PORTER, Appellant.
UNITED STATES of America, Appellee,
v.
John M. HARRISON, Appellant.
UNITED STATES of America, Appellee,
v.
Henry F. HARRISON, Appellant.
UNITED STATES of America, Appellee,
v.
John R. SCHAEFER, Appellant.
UNITED STATES of America, Appellee,
v.
Carl F. NEWLAND, Appellant.
 Nos. 19290, 19308, 19309, 19310 and 19313.
 United States Court of Appeals, Eighth Circuit.
 April 29, 1971, Rehearing Denied May 12, 13, 1971.
 
 Bernard Steinger, St. Louis, Mo., for Sidney E. Porter.
 Murry L. Randall, St. Louis, Mo., for John M. Harrison and Henry F. Harrison.
 Lester Watson, St. Louis, Mo., for John R. Schaefer.
 Joseph J. Becker, Clayton, Mo., for Carl Newland.
 Edward J. Barnes and Robert G. Clark, Special Attys., Department of Justice, Daniel Bartlett, Jr., U.S. Atty., Washington, D.C., for appellee.
 Before MATTHES, Chief Judge, LAY, Circuit Judge, and REGISTER, district judge.
 LAY, Circuit Judge.
 
 
 1
 These appeals stem from convictions on jury verdicts finding five defendants guilty on four counts of securities fraud in violation of 15 U.S.C.A. 77q(a), one count of use of the mails to offer to sell an unregistered security in violation of 15 U.S.C.A. 77e(c), and three counts of mail fraud in violation of 18 U.S.C.A. 1341. The illegal activities on which these counts were based took place in the State of Missouri from December 1964 through January 1966, during which time all petitioners engaged in the public sale of stock in the Presidential Investment Company, Inc. (hereinafter Presidential). The defendant Porter was also convicted on two counts of securities fraud in violation of 15 U.S.C.A. 77q(a) for sales made in Illinois. Of the orignal 21 count indictment, 11 counts, including one for conspiracy, were withdrawn by the government at the close of its case-in-chief. The indictment was dismissed as to two defendants at that time. Two other defendants were acquitted by the jury. We affirm the convictions on appeal.
 
 
 2
 The defendants were charged with a scheme to sell securities through the use of misleading and false statements. Of the many false representations alleged, the basic criminal charges emphasize the following: (1) that Presidential at the time of its original application, january 4, 1965, to the State of Missouri to sell securities had $305,000 cash (paid-in capital); this sum was represented on the prospectus offered to potential purchasers; (2) that monies from the stock sales would be placed in an escrow account and that at the conclusion of the offering these funds less an 8 percent commission would be released to a life insurance company which Presidential would form;(3) that the only salaries to be paid were to the three officers of Presidential (Carl Newland, John Harrison and Jefferson Mitchell); that each would receive compensation of only $5,000 per year; and (4) that each of the officers had substantial cash investments in Presidential stock.[1]
 
 
 3
 The evidence disclosed that on January 4, 1965, the time of Presidential's initial application to sell securities, Presidential had on deposit, according to its own books, only $49,344.06 in the bank. The 'trust account' in which the $305.000 was originally to have been deposited was shown to hold $232,175 as of February 24, 1965. This account had been depleted to $2,114.53 by October 1965. The evidence was not disputed that the defendants' affidavits filed with the State Commission that they had purchased shares for cash was false. From the inception of sales over $2,000,000 was realized from the public sale of stock; only $908,000 was ever deposited in the escrow account. The defendant Newland signed an escrow agreement with the Missouri Securities Commission on Presidential's behalf. Under this agreement the proceeds from the sale of stock was to be put in escrow, with release at the discretion of the Securities Commission. It provided that for each $500,000 of stock sold, $50,000 would be released to Presidential to cover expenses. The evidence was undisputed that throughout 1965 Newland withdrew over $70,000 in advances and commissions; John Harrison received over $45,000; Henry Harrison over $40,000; Porter over $29,000 and Schaefer a sum exceeding $200,000. The defendants were never successful in getting a new insurance company licensed in Missouri. Thereafter, Presidential purchased two existing companies, the St. Louis Union Insurance Co. and the Union Life Insurance Co. located in Chicago, Illinois. However, unable to obtain licenses for its agents in either Missouri or Illinois, Presidential never became active in the insurance field.
 
 
 4
 The government charged that the overall scheme included selling securities in Illinois at the same time the Missouri venture was going on. Since Presidential was not yet licensed in Illinois the modus operandi alleged was to sell interests in an investment trust owned by Porter. He in turn was to investor until Presidential stock for theinvestor until such time as Illinois residents could hold the stock legally. Th e evidence showed that these sales exceeded $150,000 of which only one $10,000 check was ever deposited in Presidential's account. Porter claimed that this washis own venture and that the other defendants were unaware of these sales.
 
 
 5
 The trial encompassed more than seven weeks and consumed over 4,000 pages of transcript. It would serve little purpose to set forth the detail of afacts other than in our discussion of the legal issues raised. After a thorough study of the record, we make the general observation that the defendants received a fair trial. The trial court's instructions fully left the ultimate decision of guilt to the jury. The defenses of good faith and lack of fraudulent intent were properly set out in the instructions. The trial court observed to the jury:
 
 
 6
 'A man may be visionary in his plans and believe they w ill suscceed, and yet, in spite of their ultimate failure, be incapable of committing conscious fraud. Human credulity may include among its victims even the supposed imposter.
 
 
 7
 'Under our system of laws men are not punished criminally for mere mistakes, mere mismanagement, mere carelessness, or mere errors of judgment. They are punished only for intentional wrongdoing. The defendants here are not on trial for errors of or mistakes or mismanagement, but are on trial for a criminal offense, and an essential element of that offense is an evil or criminal intent, which it is incumbent upon the government to prove to your satisfaction and beyond a reasonable doubt before you will be warranted in returning a verdict of guilty.'
 
 
 8
 Under the evidence the jury could have adjudged the defendants completely innocent of wrongdoing on the basis of a good faith business failure. Instead, the jury chose to find these defendants guilty of cheating and defrauding innocent victims by devious and sundry means. It is not the province of this court to agree or disagree with the finding of guilt on this record. Guilt is basically a factual issue and the verdict of the jury will not be disturbed when there exists substantial evidence to support it. We pass only on the issues of law raised here.
 
 
 9
 Although each defendant assigns individual claims of error, many of their contentions may be grouped generally for discussion. In the main the defendants assert that: (1) there exists insufficient evidence to sustain their individual convictions; (2) the mailings used to substantiate the various counts occurred subsequent to the completion of the respective sales and therefore were improperly received in evidence; (3) there existed a variance in proof from the indictment, prejudicial misjoinder and inconsistent verdicts due to the admission of evidence concerning Porter's activities in Illinois and Newland's separate bank account in Missouri; and (4) the trial court made numerous prejudicial comments. Additional claims are made relating Additional rebuttal evidence, the jury charge, refusal to receive evidence as to deductions from Schaefer's advances and other minor points. We have examined the latter complaints and are fully satisfied they constitute no prejudicial error. We move directly to discussion of the basic claims of error.
 
 1. SUFFICIENCY OF EVIDENCE
 
 10
 We find there exists substantial evidence to support the verdict of participation as to each of the defendants in a scheme to defraud investors.
 
 Carl Newland
 
 11
 Carl Newland was the first president of Presidential and Purportedly the main figure in the corporation's origination and perpetuation. Although Jefferson Mitchell (not indicted) was the secretary and treasurer, Newland and his wife maintained the company books. Newland executed the applications to sell securities publicly in Missouri and the escrow agreement with the Metropolitan National Bank in Kansas City, Missouri. He executed an affidavit as part of the state securities application that he had purchased $30,000 worth of stock. The evidence is undisputed that he gave no money for the stock. His signature was required on all bank accounts. He personally delivered $100,000 of Presidential funds to John Schaefer allegedly for influencing state officials to issue the state securities permit. Newland withdrew over $69,000 in advances. He personally made representations to purchasers of Presidential stock that the money received for the securities was being placed in escrow and that the company officers were receiving only small salaries. He was instrumental in representations that the company was actively selling insurance when in fact it was not licensed to do so.
 
 Sidney Porter
 
 12
 Porter, one of the original incorporators of Presidential, stated in his affidavit that he had purchased $35,000 worth of stock in the company. In fact he put in no money. Instead he executed a $20,000 note to the company taking $4,000 in cash and the remainder in stock. The note was never paid. Porter was involved in a 'stock venture' in Illinois when Newland offered him a position with Presidential. The proposition included $3,000 a month advance against any commissions on stock sales and a ten percent finder's fee on any insurance companies purchased through his arrangement. Porter had two salesmen in Illinois, Hale and Morlan, both of whom were acquitted in the present suit. With the help of these men Porter contacted his Illinois investors and told them he would invest their monies in Presidential under his name. His procedure was to cash the Illinois checks at the Kansas City bank and then purchase cashier checks to buy the stock which he was to keep in trust. Only one $10,000 check from the Illinois sales was ever deposited in the Presidential account in Kansas Ciry. Representations used in the sale of the 'trust' certificates in Illinois included those made by the other defendants in Missouri, e.g., that all funds would be held in escrow, that the officers were limited as to salaries, and that Presidential was actually writing insurance. Four thousand dollars was advanced to Porter's salesmen between July 1965 and September 1965. This money was withdrawn from the Presidential account in Kansas City (Metropolitan Bank) on checks signed by Porter.
 
 
 13
 From mid-January until April 28, 1965, Porter had an office in the Presidential headquarters in Kansas City. On April 28, 1965, he was elected a vice president of the company. When the life insurance companies were purchased in the summer of 1965 Porter was elected executive vice president of the Chicago company and later president of the St. Louis company. At Newland's direction Porter opened an account in a Chicago bank in the name of Presidential Investment Co., a sole proprietorship as distinguished from the Missouri corporation. Both Porter and Newland could sign checks on this account in their individual names. When the account was closed, the receipt for the money, which was given to one of the Chicago insurance agents, was sent to Presidential's headquarters in Kansas City. Porter was elected president of Presidential Investment Co., Inc., subsequent to Newland's resignation on October 18, 1965. He arranged to have an accountant audit the books. The accountant, Mr. Mangold, testified for the government at trial.
 
 John Schaefer
 
 14
 It was through Schaefer's suggestion that Presidential was formed to replace a previously unsuccessful venture operated by Newland and John Harrison. Although his commission had expired, he notarized the original application for Presidential's permit to sell securities. Schaefer's business card represented him as Presidential's vice president in charge of public relations. His main role was depicted as the influencing of state officials to obtain the necessary licenses and permits for the various companies. There was no evidence other than Schaefer's testimony that any officials were ever approached or bribed. However, the government's evidence shows that he received advances of over $200,000 from Presidential's funds. He operated from the same office as Henry Harrison in Clayton, Missouri.
 
 John Harrison
 
 15
 John Harrison, one of the original incorporators and vice president of Presidential, executed an affidavit that he had purchased $20,000 worth of stock. He did not pay any money for it. As an authorized signatory on the payroll accounts, he endorsed, along with Newland, a cashier's check for $100,000 and gave the money to Schaefer purportedly to use as pay-offs for state officials. He sold stock in the company and made the usual representations including that the company had sold insurance. He withdrew in excess of $45,000 in advances,
 
 Henry Harrison
 
 16
 Henry Harrison ran Presidential's Clayton, Missouri, office. Although not one of the officers, he on occasion signed his name as company secretary. He hired salesmen and his was an authorized signature on some of the bank accounts. His affidavit stated that he had purchased $10,000 in stock when in fact he had not paid any money into the company. The evidence showed that he withdrew over $36,000 in advances and received over $5,000 in commissions. Active in public sales, Henry Harrison made the same misrepresentations concerning Presidential as others did. The evidence showed that he conducted most of the dinner meetings in St. Louis.
 
 
 17
 Based on the above analysis we find there was sufficient evidence to support the government's charges and the jury's verdicts that each of the defendants participated in a scheme to defraud. The defendants contend that there was no evidence that they intended to defraud and that at most the record demonstrates mismanagement and a resulting business failure. Some of the parties allege that they relied on advice of counsel in taking the advances and manipulating the cash. These questions, however, belong peculiarly to the trier of fact and not to this court. Intent can seldom be shown by actual testimony reflecting a defendant's state of mind. The cases are legion that intent may properly be inferred from all the facts and circumstances surrounding the trandactions. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Isaacs v. United States, 301 F.2d 706, 724-725 (8 Cir. 1962), cert. denied 371 U.S. 818, 83 S.Ct. 32 9 L.Ed.2d 58; Blachly v. United States, 380 F.2d 665, 676 (5 Cir. 1967); Diaz-Rosendo v. United States, 357 F.2d 124, 129 (9 Cir. 1966), cert. denied 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83; Gusow v. United States, 347 F.2d 755, 756 (10 Cir. 1965), cert. denied 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159; Roe v. United States, 316 F.2d 617, 621-622 (5 Cir. 1963); Beck v. United States, 305 F.2d 595, 598 (10 Cir. 1962), cert. denied 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123. One of the salient factors in weighing the sufficiency of proof as to intent to defraud is the parties' use of material misrepresentations in carrying out their venture. Anderson v. United States,369 F.2d 11, 15 (8 Cir. 1966), cert. denied 386 U.S. 976, 87 S.Ct. 1171, 18 L.Ed.2d 136 (1967); Fabian v. United States, 358 F.2d 187, 194 (8 Cir. 1966), cert. denied 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58; Reistroffer v. United States, 258 F.2d 379, 387 (8 Cir. 1958), cert. denied 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959); Sparrow v. United States, 402 F.2d 826, 828 (10 Cir. 1968); Babson v. United States, 330 F.2d 662, 664-665 (9 Cir. 1964), cert. denied 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1045. See also Henderson v. United States, 425 F.2d 134, 138-139 (5 Cir. 1970). Intent to defraud can be properly inferred where reckless and irresponsible action ensues. Justice Holmes wrote almost a century ago:
 
 
 18
 'In the characteristic type of substantive crime acts are rendered criminal because they are done under circumstances in which they will probably cause some harm which the law seeks to prevent.
 
 
 19
 'The test of criminality in such cases is the degree of danger shown by experience to attend that act under those circumstances.
 
 
 20
 'In such cases the mens rea, ro actual wickedness of the party, is wholly unnecessary, and all reference to the state of his consciousness is misleading if it means anything more than that the circumstances in connection with which the tendency of his act is judged are the circumstances known to him.' The Common Law, p. 61
 
 
 21
 Sufficient basis for the finding of criminal intent exists here. The facts demonstrate a total disregard for monies entrusted to the defendants.
 
 
 22
 Schaefer particularly complains that the evidence is insufficient as to him because he was not an incorporator and therefore not a party to the original scheme of the others. This claim even if true must fall on the evidence that he later participated in the overall scheme of wrongdoing. Isaacs v. United States, supra, 301 F.2d at 729; Reistroffer v. United States, supra, 258 F.2d at 395; Nassif v. United States, 370 F.2d 147, 151 (8 Cir. 1966).
 
 2. MAILINGS
 
 23
 Counts 3, 4, 5, 6, 7 and 8 related to mailings of letters unlawful under the Securities Act of 1933. 15 U.S.C.A. 77q(a). Count 13 charged violation of 15 U.S.C.A. 77e(c). The other counts mentioned here were under 18 U.S.C.A. 1341 relating to mail fraud. Defendants contend that the admission into evidence of the letter supporting each count was reversible error since the various mailings occurred after the completion of the sales of Presidential stock to the respective spective count victims. In Counts 3, 4, 5, 13 and 20 the letters mailed verify the purchase of Presidential stock. Count 6 was the mailing of a stock certificate after purchase. Counts 7 and 8 on which Porter alone was convicted involved the mailings of purchase checks written by Illinois investors. The Count 14 letter was an invitation to a stockholders' dinner meeting. Count 18 was the 'Thirty Million in Thirty Days' letter described below.
 
 
 24
 It has long been held that under the Securities Act mailings which are even incidental to the fraud itself are still sufficient to support the jurisdiction of a 77q(a) violation. See Little v. United States, 331 F.2d 287 (8 Cir. 1964), cert. denied 379 U.S. 834, 85 S.Ct. 68, 13 L.Ed.2d 42; United States v. Wolfson, 405 F.2d 779 (2 Cir. 1968), cert. denied 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969).
 
 
 25
 In Bliss v. United States, 354 F.2d 456 (8 Cir. 1966), cert. denied 384 U.S. 963, 86 S.Ct. 1592, 16 L.Ed.2d 675, Judge Vogel of this court, citing United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), held that under the mail fraud statute the 'use of the mails, even after money has been obtained, is within the reach of the statute if it is for the purpose of executing the scheme, as, for example, the lulling of victims and the continuance of the relationship between the schemer and his victims.' 354 F.2d at 457.
 
 
 26
 The indictment here charged the defendants with various acts of misrepresentation and fraud for the purpose of deceiving prospective investors 'and to obtain money and property from them and to persuade then to invest and reinvest in said shares of stock of Presidential, and to lull Investors into a false sense of security with respect to their investments * * *' Illustrative of the continuing scheme as alleged and proved by the government is the mailing of the 'Thirty Million in Thirty Days' letter as set forth in Count 18. The defendants caused this letter to be sent to all stockholders on or about October 12, 1965, soliciting the purchase of $10,000 worth of life insurance from each so as to further the business of its acquired insurance companies. Presidential's abortive venture[2] into the life insurance field may be characterized as a part of the scheme which at the very least may be said to constitute one of the continuing acts of 'lulling' investors into a false sense of security. United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173 (1962); Bliss v. United States, supra; Friedman v. United States, 347 F.2d 697, 709-711 (8 Cir. 1964), cert. denied 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354 (1965); Beasley v. United States, 327 F.2d 566 (10 Cir. 1964), cert. denied 377 U.S. 944, 84 S.Ct. 1351, 12 L.Ed. 307. See also Butler v. United States, 317 F.2d 249, 255-256 (8 Cir. 1963), cert. denied, Benedec v. United States, 375 U.S. 836 and 838, 84 S.Ct. 67, 11 L.Ed.2d 65, 84 S.Ct. 77, 11 L.Ed.2d 65; Hayden v. United States, 343 F.2d 459 (9 Cir. 1965), cert. denied 382 U.S. 828, 86 S.Ct. 63, 15 L.Ed.2d 72. Cf. Henderson v. United States, 425 F.2d 134, 140-143 (5 Cir. 1970). We find each of the count mailings to be relevant to the overall scheme to defraud as set forth in the indictment and thus properly admissible in evidence.
 
 3. ILLINOIS TRANSACTIONS
 
 27
 This claim of error relates to prejudicial misjoinder, variance and prejudicial evidence concerning the defendant Porter's Illinois transactions. Porter testified, and the oter generally claim, that the Illinois investments in Porter's 'trust' were not part of Presidential's stock sales program. It is alleged that there is insufficient evidence to show only one scheme and that the Illinois venture was separate and distinct. The only party moving for misjoinder prior to trial was Schaefer. This motion was properly overruled since the indictment charged joint participation in one overall scheme to defraud investors in both Illinois and Missouri. As such there was not prejudicial joinder under Rule 8(a), Fed.R.Crim.P., so as to require severance as a matter of law. See United States v. McKuin, 434 F.2d 391 (8 Cir. 1970); Haggard v. United States, 369 F.2d 968 (8 Cir. 1966), cert. denied, Alley v. United States, 386 U.S. 1023, 87 S.Ct. 1379, 18 L.Ed.2d 461 (1967).
 
 
 28
 Schaefer, as do other defendants, alleges that the trial court should have granted a severance at the close of the government's case-in-chief since the evidence conclusively demonstrated two schemes instead of one. This court has consistently held that a motion for severance due to prejudicial misjoinder under Rule 14, Fed.R.Crim.P., must be renewed at the close of the government's evidence or at the concludsion of all of the evidence and unless made at that time it is deemed waived. See Nassif v. United States, 370 F.2d 147 (8 Cir. 1966); Finnegan v. United States, 204 F.2d 105 (8 Cir. 1953), cert. denied 346 U.S. 821, 74 S.Ct. 36, 98 L.Ed. 347. However, we need not rely upon waiver here. First, we find there existed sufficient evidence for a jury determination as to whether there was one overall scheme to defraud investors in both Illinois and Missouri or whether in fact there existed a separate scheme in each state. Second, the fact that the jury acquitted all but Porter on Counts 7 and 8 (the Illinois counts) does not constitute an inconsistent verdict or tend to substantiate the claim of two separate schemes. This has long been settled. See discussion in Koolish v. United States, 340 F.2d 513 (8 Cir. 1965), cert. denied 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724;[3] Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Certainly the defendants not convicted under Counts 7 and 8 cannot claim prejudice from the jury's failure to convict.
 
 
 29
 The claimed error that there existed a multiplicity of separate schemes with different persons so as to require a new trial must similarly fall. Cf. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). There exists no variance of proof where there is sufficient evidence to make the issue of one or more schemes a question of fact for the jury. See Berger v. United States, 295 U.S. 78, 55 S.Ct. 629 (1935); United States v. Varelli, 407 F.2d 735 (7 Cir. 1969) and Hayes v. United States,329 F.2d 209 (8 Cir. 1964), cert. denied, Bennett v. United States, 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748. Here we find there was sufficient evidence so as to connect all defendants with the overall scheme to defraud investors through the sale of Presidential stock. The following facts are among the more salient ones considered by the jury: (1) Porter forwarded a check for $10,000 for an Illinois investment to the Presidential bank account in Kansas City; (2) Porter, with Newland as co-signer, opened a personal account in a Chicago bank for monies received from sales in Illinois (the account was named Presidential Investment Co. although as indicated it was an individual account); (3) when the account was closed the receipt for the money was sent to Presidential's Kansas City headquarters; (4) Porter openly represented that his Illinois salesman were employees of Presidential; (5) John Harrison received a check made out to him from Porter written on the Chicago bank; (6) the Illinois salesmen were paid with checks signed by Porter and John Harrison drawn on Presidential's Kansas City account; (7) some Illinois investors made their checks out to Presidential instead of Porter; and (8) Porter submitted expenses incurred in Illinois for the overall audit of Presidential.
 
 
 30
 These items alone make the issue of variance one of fact for the jury. We find no prejudice to any of the parties by their admission or by the court's rulings.
 
 
 31
 It is similarly claimed that evidence relating to Newland's separate account in Missouri should have been ruled inadmissible. Our discussion concerning the substantive law as to the Illinois transactions is again applicable. There exists sufficient evidence in the case as a whole for the jury to determine whether this too was part of the overall scheme.
 
 4. COMMENTS OF THE TRIAL JUDGE
 
 32
 We now turn to the more difficult question concerning the trial court's comments.
 
 
 33
 Although on rare occasion discipline of counsel or parties may require unusual action by the court, there should always remain above all else the neutrality of the trial court manifesting to the jury no inkling of one-sidedness or bias. When comments of the trial court exceed the boundaries of fair discipline by official disparagement of counsel or of a litigant's case, then orror must follow. It is charged that this happened here. We have reviewed the record and agree that many of the court's comments bordered on, and in some instances exceeded, the confines of judicial propriety.[4]
 
 
 34
 Throughout the trial each defense counsel attempted to preserve individual consideration for his client to avoid the plague of 'group guilt' charged and inseminated by the government.[5] Although each defendant disclaimed 'group intent' to enter into a scheme to defraud, each counsel was faced with rulings by the court which told the jury in only general terms to keep the evidence separate as to each of the defendants. Yet the court required that one defense counsel speak for all defendants on objections and that each counsel be limited to one cross examination. We do not necessarily indicate disagreement with the district court's procedure, other than to observe that it posed perplexing difficulties to each defense counsel's attempt to assure adequate protection of his client's separate interest. This was especially true since the defendants were not in total alignment and in some instances attempted to cast blame one upon the other.
 
 
 35
 In extended litigation with multiple parties the court faces difficult administrative decisions necessary to expedite the trial. Neither counsel nor a defendant may 'run' the trial. Notwithstanding these considerations, in our quest for an orderly trial we must never lose sight of the balance of fairness always to be struck. Much has been recently written concerning the disciplinary measures that a court may invoke to control disorderly counsel or a party defendant. However, a court should never forget that defense counsel's role in a criminal proceeding is that of an adversary who is not required to remain docile in deference to the government or the court when he feels his client's rights are being procedurally threatened. In fact, under such circumstances it is not only his duty to make respectful protest, and there is no question that such respect was shown here, but to make that protest vigorous as well. The administration of criminal justice depends upon the thorough and courageous advocacy of counsel. Representation of a defendant in a criminal case should never be frustrated by the court to the point of ineffectiveness.
 
 
 36
 We are fully aware that judges are human and succumb to common frailties such as impatience. But a trial judge must ever be mindful of the important role he occupies in presiding over a trial where valuable rights and liberties of the litigants are at stake. He is duty bound to exercise patience and restraint in his rulings so that the fundamental right of the parties to a fair and imparital trial is protected and preserved. If counsel, who are officers of the court, violate the canons of ethics and offend the bounds of properiety, adequate disciplinary sanctions are available. But absent circumstances not revealed in this record, the trial judge should guard against engaging in remarks or conduct in the presence of the jury which can and may have a prejudicial effect upon the jury.
 
 
 37
 Chief Judge Lumbard observed in United States v. Guglielmini, 384 F.2d 602, 605 (2 Cir. 1967), where a trial judge used similar reproachful comments to defense counsel:
 
 
 38
 'These remarks can only have served to discredit the defense in the eyes of the jury. * * * This discussion also discredited the defense and may have led the jury to believe that the defense was making demands which improperly imposel upon the government.
 
 
 39
 'The trial judge's frequent participation in the trial, by questions and comments, also tended to give the jury the impression that he credited the prosecution and disbelieved the defense.'
 
 
 40
 Whether or not error by reason of the court's comments is so prejudicial as to require a new trial is not resolved by a standard of facile application. The rule was stated in a similar context in Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct 229, 11 L.Ed.2d 171 (1963), that error is not harmless if there is a 'reasonable possibility' that the matter complained of might have contributed to the conviction. Cf. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); and Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Judge Johnsen of this court observed in Homan v. United States, 279 F.2d 767, 771 (8 Cir. 1960), cert. denied 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88:
 
 
 41
 'Error of the trial court which may be prejudicial in a close criminal case, in the sense of being capable in such a situation of possibly affecting the result, can well be without any such rational possibility in a strong case, and thus not entitle the defendant to a reversal of his conviction. The reviewing court must, of course, be able to say with fair assurance that the errors complained of could not, with natural operation in the total setting and proceedings had, be regarded as having possessed any influencing effect.'
 
 
 42
 Using these tests we determine that as to each of the defendants there was not sufficient prejudice to require reversal. We view this record as presenting a 'strong' case as to each defendant and on balance we cast our judicial doubt that the comments, although improperly made, in any manner influenced the outcome. The trial ran for over seven weeks and the instances of erroneous comments occupy only brief moments in the overall proceedings. It is difficult for appellate judges to place themselves in the subjective role of a juror to assess the prejudicial effect of erroneous comment. Jurors are not isolated machines which may be tested for bias by computerized analysis. They each possess human emotions, reactions and intelligence of varying degrees. Experience and study[6] indicate, however, that the composite jury possesses far more intelligence than most judges and lawyers credit to it. The ability to fairly weigh the evidence, to discard irrelevancies, to assess equity and to ignore prejudicial comment of lawyers and judges alike is the underlying strength of the jury system. This is not to say that the improper comment will in all cases be ignored. Each record must always speak for itself. Based on our reading of the entire record here, we must conclude that the jury was not influenced by the comments of the court in such a way as to alter its verdict.
 
 
 43
 The defendant Henry Harrison raises a separate claim of error contending that the trial court's comments violated his Fifth Amendment right not to testify. The record displays the following colloquy:
 
 
 44
 'MR. REHM: Your Honor, at this time I would like to ask leave of court to exhibit to the jury for purposes of comparing signatures Plaintiff's Exhibits 188, 220 and the affidavit of Henry Harrison in Exhibit 1.
 
 
 45
 'THE COURT: Well, what is the purpose of this, Mr. Rehm?
 
 
 46
 'MR. REHM: The purpose of this is so the jury will see that it is not his signature.
 
 
 47
 'THE COURT: We're going to have to have testimony about it first. This man hasn't even testified yet. There isn't any need of them doing any comparing of signatures until we hear what he has to say about that.
 
 
 48
 'MR. REHM: I move the court for a mistrial for Mr. Henry Harrison.
 
 
 49
 'THE COURT: Do I understand you are going to call him?
 
 
 50
 'MR. REHM: No, sir.
 
 
 51
 'THE COURT: The jury can completely disregard that, but I will-- do you want to object to it or what are you going to do?'
 
 
 52
 In Davis v, United States, 357 F.2d 438, 441 (5 Cir. 1966), cert. denied 385 U.S. 927, 87 S.Ct. 284, 17 L.Ed.2d 210, the court observed:
 
 
 53
 'The facts and circumstances of each case must be carefully analyzed to determine 'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' Knowles v. United States, 224 F.2d 168, 170 (10th Cir. (1955); see United States v. Fay, 349 F.2d 957 (2d Cir. 1965).'
 
 
 54
 We do not feel the court's remarks were intended to be, or could reasonably be construed to be, prejudicial comment on the defendant's constitutional right. Additionally, on the present record we find such comment at most to be harmless error. Cf. United States v. Warner, 428 F.2d 730, 740 (8 Cir. 1970), cert. denied 400 U.S. 930, 91 S.Ct. 194, 27 L.Ed.2d 191.
 
 
 55
 Finding no prejudicial error and satisfied that the evidence sufficiently substantiates the verdicts of conviction, we affirm.
 
 
 56
 Judgments affirmed.
 
 
 
 [1]
 Affidavits were signed by the defendants that each had bought and paid for the following stock: Carl Newland, 6,000 shares for $30,000; Henry Harrison, 2,000 shares for $10,000; Sidney Porter, 7,000 shares for $35,000; and John Harrison, 4,000 shares for $20,000
 
 
 [2]
 'Contrary to the contentions of counsel, the indictment alleges that the scheme devised was to obtain money or property by false pretenses. It is not essential that it be alleged that those to whom communications were sent by mail were in fact defrauded or that money was obtained from them. If, as alleged, the mails were used in carrying out a fraudulent scheme, it was quite immaterial whether the scheme were successful or unsuccessful. Busch v. United States, supra, (8 Cir., 52 F.2d 79;) Barnes v. United States, 8 Cir., 25 F.2d 61; Cochran v. United States, supra, (8 Cir., 41 F.2d 193;) Muench v. United States, 8 Cir., 96 F.2d 332.' Baker v. United States, 115 F.2d 533, 538 (8 Cir. 1940), cert. denied 312 U.S. 692 S.Ct. 711, 85 L.Ed. 1128
 
 
 [3]
 In Koolish v. United States, supra, the court said:
 "Consistency in the verdicts is not necessary. Each count in an indictment is regarded as if it was a separate indictment.' Dunn v. United States 1931, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356; Downing v. United States, 8 Cir., 1946, 157 F.2d 738. Conviction on one mail fraud count will stand even though inconsistent with acquittal on other counts. 'Whether a scheme is one conspiracy or several is primarily a jury question, since it is a question of fact as to the nature of the agreement.' United States v. Crosby, 2 Cir., 1961, 294 F.2d 928, 945, certiorari denied Mittleman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523, rehearing denied 369 U.S. 881, 82 S.Ct. 1138, 8 L.Ed.2d 285.' 340 F.2d at 525-526.
 
 
 [4]
 There are numerous instances which are challenged. For example, on more than one occasion defense counsel was adminished for 'deliberate tactics' and on another for 'blowing smoke rings' to 'confuse the jury.' There are several occasions where counsel is reprimanded for delaying the trial. In one instance the following colloquy took place in the presence of the jury:
 'MR. STEINGER (attorney for Porter): Yes, let the record show the United States District Attorney has supplied me the handwritten statement.
 'If it please your Honor, I would like to ask for a ten-minute recess for the reason there are some changes that have been made as evidenced by the first page, and I would like to compart it to all the pages because that change is not indicated on page 1.
 'THE COURT: Let's don't make a speech about that. I would say to you without the slightest fear of any contradiction if there's a difference in them, there's some misunderstanding somewhere about it, because I know that the government is not in the habit of giving information to people that is untrue and incorrect, and I don't think you ought to be making that statement unless you can back it up.'
 All defendants moved for a mistrial and this was overruled. The court rufused to admonish the jury to disregard his statement.
 
 
 [5]
 The specter of guilt by association is a grave danger in any trial of several defendants charged with a common scheme or conspiracy. As Mr. Justice Rutledge observed in Blumenthal v. United States, 332 U.S. 539, 559-560, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947):
 'Perhaps even at best the safeguards provided by clear rulings on admissibility, limitations of the bearing of evidence as against particular individuals, and adequate instructions, are insufficient to ward off the danger entirely. It is therefore extremely important that those safeguards be made as impregnable as possible.'
 
 
 [6]
 See generally, H. Kalven and H. Zeisel, 'The American Jury' (1966)