UNITED STATES of America, Appellee,

v.

Percy ROCHON, Appellant.

UNITED STATES of America, Appellee,

v.

Edward CABBELL, Appellant.

UNITED STATES of America, Appellee,

v.

Bonnie Marie JOHNSON, Appellant.

Nos. 77-1759, 77-1816 and 77-1817.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 9, 1978.

Decided April 26, 1978.

Rehearing and Rehearing En Banc Denied May 6, 1978.

Alfred G. Parrish, argued and filed brief, Des Moines, Iowa, for appellant Rochon.

James H. Reynolds, U. S. Atty., Daniel T. Cutler, Sp. Asst. U. S. Atty., Sioux City, Iowa, argued and filed brief for appellee in Nos. 77–1759 and 77–1816 and 77–1817.

Dan T. McGrevey filed brief and appendix for appellants in Nos. 77–1816 and 77–1817.

Dan T. McGrevey, Price & McGrevey, Fort Dodge, Iowa, for appellants Cabbell and Johnson.

Before BRIGHT, STEPHENSON and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

In early June, 1977 the federal grand jury for the Northern District of Iowa returned a forty-two count indictment charging Bonnie Marie Johnson, Edward Cabbell, Beverly New and Percy Rochon with violations of a number of the criminal laws of

the United States relating to the interstate transportation of falsely made or forged securities, 18 U.S.C. § 2314, receiving and concealing falsely made or forged securities in violation of 18 U.S.C. § 2315, willful perjury before federal grand juries, 18 U.S.C. § 1623(a), and conspiracy to commit offenses against the United States, 18 U.S.C. § 371.

The defendants with whom we are directly concerned, Johnson, Cabbell and Rochon, pleaded not guilty to the charges against them and were tried before a jury in August, 1977 with Chief District Judge Edward J. McManus presiding. They were all found guilty on all of the counts in which they were named as defendants, and in September, 1977 the district court imposed severe sentences of imprisonment on all three of them. They have appealed.[1]

In seeking reversals the defendants do not attack the sufficiency of the indictment or the sufficiency of the evidence to sustain the verdicts.

Rochon contends simply that the district court erred in refusing to grant him a trial separate from that of Cabbell and Johnson.

Cabbell and Johnson contend that the government did not timely furnish them with exculpatory material as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). They also claim that they were deprived of the adequate assistance of counsel because counsel did not have sufficient time to familiarize themselves with the case and prepare a defense.

We find no merit in the contentions of the defendants, and we affirm all three convictions.

*Facts and Procedural History.*

In view of the narrow positions taken by the defendants, we feel justified in stating the facts of the case as the jury would have been justified in finding them, and probably did find them under the evidence when viewed in the light most favorable to the government and giving the government the benefit of all reasonable inferences favorable to it.

Basically, the charges against the defendants grow out of the fact that in June, 1976 thirty falsely made and forged commercial money orders issued by American Express Company and drawn on the First National Bank of Denver, Colorado were caused to be transported from points in Iowa to the Bank just mentioned in violation of 18 U.S.C. § 2314.

Those thirty money orders were completed on blanks which, with numerous others, had been consigned and mailed by American Express Company to a drugstore in Omaha, Nebraska, which was a distributing agent for money orders issued by the Company.[2] The blanks were mailed to the drugstore in February, 1976. In March, 1976 the drugstore was the subject of an armed robbery by two men, and in the course of the robbery the pharmacist in charge of the establishment was shot and critically wounded. It appears that as a result of his wound he has been rendered totally and permanently disabled.

The robbers stole from the drugstore a total of 320 blanks involving a potential loss of $64,000.00.[3] The girl friend of one of the

---

1. The appeal of Rochon has been prosecuted separately from those of Johnson and Cabbell which have been prosecuted jointly. However, the three appeals were consolidated for purposes of argument and were heard and submitted together. We note that appellate counsel for Johnson and Cabbell was appointed by this court after the trial attorneys who represented those defendants in the district court sought and obtained leave to withdraw as counsel after the notices of appeal were filed.

2. American Express money order blanks are issued in books of twenty with $200.00 being

the maximum amount for which any one money order may be completed validly. Thus, the money order blanks in each book have, when completed, a maximum value of $4,000.00. Completion of a money order blank involves a mechanical stamping of the blank with the amount of the money order and identification of the purchaser or sender of the order and the payee thereof.

3. *See* n.2, *supra.* That loss would not have been borne by either the drugstore or by American Express but by the bankers or merchants

robbers came into possession of a number of blanks and passed some of them herself. She sold one book of twenty blanks to Cabbell in Omaha for $100.00 or 2.5% of the maximum value of the blanks. She gave another book of blanks to Leon Jenkins, an acquaintance of Cabbell, and the blanks in that book or some of them appear to have come into Cabbell's possession.[4]

■ Those blanks were transported from Nebraska to Iowa and were completed in the latter state. Upon their completion they unquestionably became "securities" as defined in 18 U.S.C. § 2311 and were covered by § 2314. *Cf. United States v. Jackson*, 576 F.2d 749 (8th Cir. 1978).

Cabbell obtained at least twenty-five of the blanks in question, and we will refer to them as the "Cabbell blanks." Those blanks were filled out in sums from $190.00 to $198.23, and on each blank "Mary A. Straight" was identified as the payee.

The remaining five blanks may have come into the possession of the defendant, Rochon; certainly, at least four of them were handled by him at some stage because his latent fingerprints appeared on them when they were examined by the Federal Bureau of Investigation in the course of its investigation of the interstate transportation of this group of securities. And the fifth blank was closely connected with the other four when the five blanks are considered from the standpoint of serial numbers. Those five blanks, which we will call the "Rochon blanks," were filled out to show "Lita L. Church" or "Lori M. Evans" as payee. Two of the blanks were filled out in the sum of $185.00 each, and the other three were filled out for $175.00 each.

The Cabbell blanks were negotiated on June 9 and June 10, 1976 by Bonnie Johnson, apparently at the instance and to some extent with the assistance of Cabbell, at four banks in the small cities of Algona, Eagle Grove, Humboldt and Webster City, Iowa, all of which are located in the vicinity of the larger city of Fort Dodge.[5] The modus operandi may be described as follows.

Shortly before negotiating the money orders Johnson appeared at each of the target banks and established a false identity for herself as "Mary A. Straight," or as "Mary Straight," and opened a small checking account in that name. With that foundation laid, negotiation of the securities could begin.[6]

On June 9, 1976 Johnson appeared at the Iowa State Bank at Algona where she endorsed and deposited five money orders, each in the sum of $190.00, and each made payable to Mary A. Straight. Johnson's account in that name was credited with the full amount of the deposit. Those five money orders became the subject of Counts 1–5 of the indictment, and Bonnie Marie Johnson was the only defendant named in those counts.

On the same day Johnson, posing as Mary A. Straight, appeared at the First National Bank of Humboldt where she deposited five "Straight" money orders varying in amount from $191.31 to $198.23. Likewise on the same day Johnson appeared at the Farmers National Bank at Webster City where she deposited ten of the "Straight" money orders ranging in amount from $190.00 to

---

who might have accepted the money orders after they had been fraudulently completed.

4. The woman above mentioned testified at the trial. She stated that in 1976 she was a user of cocaine. It appears from her testimony that while she was passing some of the completed money order blanks that had been taken in the drugstore robbery, she was also passing some stolen United States Postal money orders. She was prosecuted by federal authorities with respect to those money orders but was not prosecuted in connection with the American Express money orders that she passed.

5. Eddie Cabbell, who is sometimes known as "Fast Eddie," operates a massage parlor in Fort Dodge, and Bonnie Marie Johnson is one of his employees.

6. In her appearances at the respective banks Johnson was dressed in a manner and wore her hair in a style (or wore a wig) that was designed to attract a good deal of attention from bank employees but which would make it extremely difficult for those employees to identify her in more conventional garb or wearing a more conservative hair style.

$197.34. Those fifteen money orders became the subject matter of Counts 6–20 of the indictment, and in those counts both Ms. Johnson and Cabbell were named as defendants.

On June 10, 1976 Johnson, still posing as Mary A. Straight, deposited five "Straight" money orders, each in the sum of $190.00, at the Eagle Grove State Bank in Eagle Grove. Those five money orders became the subject matter of Counts 21–25 of the indictment, and in those counts Johnson was the sole defendant named.

All of those twenty-five money orders negotiated by Johnson moved in ordinary banking channels from the Iowa banks which had accepted them to the First National Bank of Denver, Colorado. When they were presented to American Express Company, they were rejected as having been stolen, and they were returned in due course to the Iowa banks. Naturally, while the items were in transit, Johnson withdrew most of her fraudulent deposits from the banks by means of checks that she drew on the accounts that had been opened in the name of Mary A. Straight.[7]

Turning now to the "Rochon blanks," it appears that after completion they were passed at mercantile establishments in various points in Iowa, including Cedar Rapids in the eastern part of the state, and it is inferable that they were passed by Beverly New who at the time was Rochon's paramour and whom he later married.

Count 36 of the indictment charged that between May 1 and June 13, 1976 Rochon unlawfully received and concealed four specifically described blanks which were among those taken in the robbery of the Omaha drugstore. And Count 42 charged Beverly New with passing at the Me Too Store in Cedar Rapids a money order that it may fairly be said was made out on one of the Rochon blanks, although not one of the blanks described in Count 36.[8] That money order, like all of the others involved in the case, passed in due course of business from Iowa to the drawee bank in Denver where payment was refused by American Express Company.

In November, 1976 the federal grand jury for the Northern District of Iowa was investigating the criminal operations that have been described, and the defendants Johnson and Rochon testified after having been duly advised of their rights. The testimony of both of them was entirely exculpatory. With specific regard to the testimony of Rochon, he stated under oath that he had never possessed, seen, touched or handled any of the four blanks that were described in Count 36 of the indictment.

That testimony in 1976 resulted in the 1977 grand jury indicting Johnson on ten counts of perjury (Counts 26–35) and Rochon on four counts of perjury (Counts 37–40).

In addition to indicting the defendants on the substantive charges that have been mentioned, the grand jury also indicted Johnson, Cabbell and Rochon for conspiracy to violate § 2314. One of the overt acts alleged was that Cabbell borrowed an automobile from Craig Foster, a car salesman in Fort Dodge, which automobile Cabbell then turned over to Johnson "for the purpose of driving said vehicle to the various banks at which the money orders described in Counts

---

**7.** It should perhaps be said at this point that there is a Mary A. Straight who resides in Fort Dodge and who is a registered nurse. She testified at the trial and positively denied any knowledge of or connection with the "Straight" money orders that were negotiated by Johnson. Specifically Ms. Straight denied that she had ever seen any of the money orders, or that she had endorsed any of them, or that she had deposited any of them in the victimized banks.

**8.** The money order that New was charged with passing in Cedar Rapids was drawn so as to show that the payee was Rita L. Church. The record reflects that there is a Rita Church who lives at Muscatine, Iowa, which is not a great distance from Cedar Rapids. Like Ms. Straight, Ms. Church testified at the trial and denied any connection with the money order that was passed, allegedly by Beverly New, in Cedar Rapids. Ms. Church also testified that in the summer of 1976 her bag and its contents including her social security card were stolen while she was swimming in a stone quarry, and that she had never recovered either the bag or the contents.

1 through 25, above, were cashed and deposited, and withdrawing from said banks the funds generated by such deposits."

Johnson, Cabbell and Rochon all pleaded not guilty. At some time following the return of the indictment Beverly New entered a plea of guilty to Count 42 as the result of a plea bargain which involved her agreement to testify as a government witness.

Motions were filed by the other defendants which motions included one filed by Rochon to sever the charges against him from the charges against the other defendants, and to grant him a separate trial. That motion was denied. Prior to the commencement of the trial, the government dismissed the receiving and concealing count against Rochon (Count 36) and also dismissed the conspiracy count (Count 41) as to him. That action left Rochon charged only on four counts of perjury (Counts 37–40). When that development took place, Rochon filed a second motion for severance and separate trial, and the motion was again denied but without prejudice to renewal in the course of the trial.

Immediately prior to the commencement of the trial counsel for the defendants Rochon and New (by then Mrs. Rochon) advised the court that the latter defendant would not testify for the government and desired to withdraw her original plea of guilty. The district judge did not act on the question of the withdrawal of the plea of guilty at the time, and we do not know what disposition was finally made of the charge against Mrs. Rochon.

Trial of the case formally began on August 15, 1977; however, the taking of testimony did not begin until August 18, and the trial was concluded on August 19.

In support of its case the government called numerous witnesses, including expert witnesses, and introduced a substantial number of documentary exhibits. None of the defendants took the stand, and Rochon called no witnesses. Witnesses were called by Cabbell and Johnson.

Counsel for Cabbell sought to establish by his witnesses that Craig Foster did not lend an automobile to Cabbell as mentioned in the indictment, that a woman by the name of Wanda Funkhauser had been accused at one time as being the person who deposited the money orders in the bank at Algona, and that the identifications of Ms. Johnson by bank employees were unreliable. Ms. Johnson herself called one witness, a fellow employee in the massage parlor, to establish that Johnson worked at the parlor on both June 9 and June 10, 1976 and could not have been the person who deposited the several Mary A. Straight money orders in the several banks that have been mentioned.

In the course of the trial counsel for Cabbell and Johnson moved for a mistrial as to their clients on the ground that *Brady* material had not been timely furnished. The motion or motions were overruled. Post trial motions for judgments of acquittal notwithstanding the verdicts or for a new trial filed on behalf of Cabbell and Johnson were denied, and the three convicted defendants were sentenced on September 19, 1977.

*Rochon's Appeal.*

As mentioned, Rochon contends for reversal that the district court erred in denying him a separate trial. That contention must be evaluated in the light of Fed.R.Crim.P. 8 and Fed.R.Crim.P. 14. Rule 8 deals with permissible joinder of counts in a single indictment and with permissible joinder of defendants in the same indictment. Rule 14 deals with relief from prejudicial joinder of charges or defendants.[9]

---

9. Rule 8. Joinder of Offenses and of Defendants

(a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) Joinder of Defendants. Two or more defendants may be charged in the same in-

It is settled in this circuit that a motion for relief from an allegedly prejudicial joinder of charges or defendants raises a question that is addressed to the judicial discretion of the trial court, and this court will not reverse in the absence of a clear showing of abuse of discretion. *United States v. Losing,* 560 F.2d 906, 911 (8th Cir. 1977); *United States v. Jackson,* 549 F.2d 517, 523 (8th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977); *United States v. Graham,* 548 F.2d 1302, 1311–12 (8th Cir. 1977); *United States v. Johnson,* 540 F.2d 954, 959 (8th Cir. 1976), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 647, 50 L.Ed.2d 628 (1976). And in showing an abuse of discretion in this area a defendant shoulders a "heavy burden." *United States v. Graham, supra,* 548 F.2d at 1311; *see also Williams v. United States,* 416 F.2d 1064, 1070 (8th Cir. 1969).

Another relevant principle is that persons charged with having been involved in a single conspiracy should ordinarily be tried together. *United States v. Losing, United States v. Jackson* and *United States v. Graham, all supra.*

In view of those principles it is obvious that the district court did not err in refusing to grant Rochon's first motion for a severance since when that motion was filed and acted upon Rochon was still charged with having conspired with his co-defendants to violate § 2314, and he was also charged with having unlawfully received and concealed money order blanks that had been taken in the same robbery as that in which the Cabbell blanks had been taken.

Somewhat different circumstances surround Rochon's motion for a severance that was filed after the receiving and concealing count had been dismissed and after the conspiracy count had been dismissed as to him. Those dismissals left Rochon charged with nothing but four counts of perjury.

With respect to this motion, the government contends, first, that since the motion for severance was not renewed at the close of the government's case or at the close of all of the evidence, Rochon's right, if any, to a separate trial was effectively waived. And the government also contends that regardless of any question of waiver the district court did not err in overruling the second motion for a separate trial.

As to waiver, the government's contention would appear to be well founded. *United States v. Lewis,* 547 F.2d 1030, 1032 (8th Cir. 1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977); *United States v. Johnson, supra.* In *Johnson* we said, 540 F.2d at 959:

> Moreover, the motions for separate trials were not renewed at the close of the government's case or prior to the final submission of the case to the jury; neither defendant moved for a mistrial on the ground of prejudicial joinder, and no objection was made to the closing argument of Johnson's attorney. Such being the case we conclude that in any event the pretrial demands for separate trials were effectively waived. *United States v. Verdorn,* 528 F.2d 103, 106 (8th Cir. 1976); *United States v. West,* 517 F.2d 483, 484 (8th Cir.), *cert. denied,* 423 U.S. 948, 96 S.Ct. 365, 46 L.Ed.2d 283 (1975); *United States v. Porter,* 441 F.2d 1204, 1212 (8th Cir.), *cert. denied,* 404 U.S. 911, 92 S.Ct. 238, 241, 30 L.Ed.2d 184 (1971).

dictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Rule 14. Relief from Prejudicial Joinder

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

■ However, apart from the government's claim of waiver, we are satisfied that Judge McManus did not abuse his discretion in denying the second motion for a severance and that Rochon suffered no prejudice as a result of being tried along with Cabbell and Johnson.

When the second motion was made, Judge McManus was not in a position to know precisely what the proof in the case would show with respect to Rochon's connection with the over-all transactions involving the negotiation and interstate transportation of the thirty stolen money orders involved in the case or with respect to his connection with Cabbell and Johnson. The action of the government in dismissing Count 36 and in dismissing Count 41 as to Rochon did not change the underlying facts of the case. The perjury counts were geared to the four money orders described in dismissed Count 36. Those four money orders, along with the one negotiated in Cedar Rapids by Beverly New came from the same set of money orders as did those that were negotiated by Johnson in collaboration with Cabbell. All of the money orders were passed at about the same time.

The government was careful in its presentation of the case to compartmentalize its evidence and to connect particular items of evidence with particular defendants. We do not think that the jury was likely to have been confused as to what evidence was applicable to which defendant. There was nothing in the evidence against Johnson and Cabbell to inflame the jury against Rochon. And the jury was instructed as follows:

INST. NO. 17

You should give separate consideration and render separate verdicts with respect to each defendant, as to each count. Each defendant is entitled to have his guilt or innocence as to each of the crimes charged determined from his own conduct and from the evidence which applies to him, as if he were being tried alone.

The guilt or innocence of any one defendant of any of the crimes charged should not control or influence your verdicts respecting the other defendants. You may find any one or more of the defendants guilty or not guilty. At any time during your deliberations you may return your verdict of guilty or not guilty with respect to any defendant on any count.

So, Rochon's assignment of error is rejected.

*Appeals of Johnson and Cabbell.*

As has been stated, Johnson and Cabbell contend that the government failed to make timely disclosure to defense counsel of the existence of allegedly exculpatory evidence of which the government was aware, and that they were deprived of the effective assistance of counsel in that counsel did not have adequate time within which to prepare for trial.

■ There is no question that a prosecutor, whether state or federal, owes a constitutional duty to an accused to make timely disclosure to him of the existence of material exculpatory evidence that the prosecutor knows to exist. In addition to *Brady v. Maryland, supra,* see *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *DeMarco v. United States,* 415 U.S. 449, 94 S.Ct. 1185, 39 L.Ed.2d 501 (1974); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Sanders v. United States,* 541 F.2d 190 (8th Cir. 1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 784 (1977); *United States v. Smith,* 538 F.2d 1332 (8th Cir. 1976); *Austin v. Wyrick,* 535 F.2d 443 (8th Cir. 1976); *Weiland v. Parratt,* 530 F.2d 1284 (8th Cir.), *cert. denied,* 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 118 (1976).

Moreover, certain material not available to a defendant under *Brady,* et al., may be available to him as provided by the Jencks Act, 18 U.S.C. § 3500.[10]

---

10. § 3500. Demands for production of statements and reports of witnesses

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which

It would prolong this opinion unduly to discuss the *Brady* phase of the case in detail. Suffice it to say that we have considered the record and are of the opinion that government counsel and the trial judge fully discharged their duties under both *Brady* and the Jencks Act and that no error was committed in those connections.

There remains for consideration the contention of Cabbell and Johnson that they were deprived of the adequate assistance of counsel because counsel did not have sufficient time to familiarize themselves with the case and to prepare for trial. We reject that claim as well as the *Brady* claims. Some comment is desirable.

First, we do not consider that the defendants raise any question as to the competency of trial counsel or as to their integrity or diligence. As we understand it, the defendants contend simply that their lawyers did not have time to get ready for trial and that motions for a continuance filed by both defendants on August 5, 1977 should have been granted.

The record reflects that throughout the proceedings in the district court Cabbell was represented by Don W. Sylvester of Sioux City. The appendix supplied by Cabbell and Johnson contains an affidavit from Cabbell to the effect that he was not able to employ counsel until August 1, 1977, that he employed Mr. Sylvester on that date, which was two weeks in advance of the date set for the trial, and that after being employed Mr. Sylvester insisted on taking a week's vacation during which he did not work on the case.

That affidavit conflicts squarely with the facts shown by the records of the clerk of the district court. The indictment was returned on June 9, 1977, and Cabbell seems to have been arrested around June 17, 1977. In any event he appeared before a United States Magistrate on that date and was released on bail in the sum of $10,000.00. On June 20 Cabbell was before another Magistrate; he entered a plea of not guilty and indicated he would retain counsel. The record also reflects that Mr. Sylvester was retained and entered his appearance as counsel for Cabbell on June 27, 1977 and was active in the case thereafter.

The situation with respect to Bonnie Marie Johnson is somewhat different. She was represented initially by Daniel C. Galvin of Sioux City. However, Mr. Galvin filed a motion to withdraw as counsel on July 7, 1977. On July 13 Judge McManus permitted Galvin to withdraw on the condition that Johnson secure new counsel by July 19, and the order provided that if Johnson wanted counsel appointed to represent her, she should apply for such appointment by July 18, 1977. Ms. Johnson had not retained counsel by July 19, and on July 21 she was ordered to appear before the court and explain her failure to secure a new attorney. A hearing was apparently held on July 27, and Johnson was given until July 29 to secure a lawyer.

Finally, on August 3, 1977 Mr. P. D. Furlong of Sioux City appeared as counsel for Johnson, and Mr. Galvin was permitted to withdraw as counsel.

Mr. Furlong served thereafter as counsel for Johnson and gave her vigorous representation throughout the trial. Presumably, prior to the trial he was made familiar with what Mr. Galvin knew about the case and also had the benefit of what Mr. Sylvester had learned. Certainly, there is nothing to show that he did not receive such information.

was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

\* \* \* \* \* \*

On August 5 motions for continuance were filed by both defendants, and Johnson also moved for a trial separate from that of Cabbell. Those motions were denied. In the course of the trial counsel for Johnson and Cabbell made common cause in defending their respective clients, and there was no apparent conflict of interest between Cabbell and Johnson.

While appellate counsel for Cabbell and Johnson have couched the contention under discussion in terms of adequacy of assistance of counsel, what this aspect of the case really boils down to is the question of whether Judge McManus should have granted to the defendants the continuance requested on August 5, 1977, and that was a matter largely within the discretion of the trial judge.

Although this case involved numerous counts and plural defendants, and while it involved thirty separate money orders and the dispositions that were made of them, the case was not actually a particularly complex one. The guilt of Johnson hinged entirely and that of Cabbell hinged in large measure on nothing but a question of identity. Was Bonnie Marie Johnson the woman who passed herself off at the Iowa banks as Mary Straight or Mary A. Straight?

While the government's case with respect to this issue had its weaknesses, which were fully exploited by defense counsel, the case against the defendants was a strong one.

We are satisfied that counsel had ample opportunity to get ready for trial, and that they could have done no better than they did had more time been available to them. We are convinced that in the circumstances of the case, including the lack of diligence on the part of Johnson in obtaining new counsel after Mr. Galvin had indicated his desire to withdraw from the case, the trial judge did not abuse his discretion in denying the motions for continuance and requiring the defendants to adhere to the original trial schedule.

Affirmed as to all three defendants.