STATE OF HAWAII, Plaintiff-Appellee, *v.* JAMES POKINI, Defendant-Appellant.

NO. 5485

and

STATE OF HAWAII, Plaintiff-Appellee, *v.* WILLIAM MOORE, Defendant-Appellant.

NO. 5486

AUGUST 29, 1974

RICHARDSON, C.J., LEVINSON, KOBAYASHI, OGATA AND MENOR, JJ.

OPINION OF THE COURT BY LEVINSON, J.

The defendants-appellants Pokini and Moore were jointly tried and subsequently convicted and sentenced to thirty

years in prison for their alleged parts in a robbery of the Oahu Sugar Company by several armed individuals on April 28, 1972. On appeal they raised a variety of substantial claims that their right to a fair trial was denied, and therefore that we must reverse their convictions and sentences.

A majority of this court agrees that reversal is necessary. Justice Ogata joins this opinion in its entirety. Justice Menor joins in part III of this opinion. Justice Menor also finds reversible error in the trial judge's *voir dire* procedure, but for reasons which are different from those expressed in part I of this opinion, and which are set forth in his separate opinion.

### I. RESTRICTED *VOIR DIRE* OF PROSPECTIVE JURORS IN THE AREA OF PRE-TRIAL PUBLICITY

The first issue raised by the appellants is whether the trial judge erred in "pre-empting" the pre-trial *voir dire* of prospective jurors.

In my view, the issue here is not whether the trial judge erred in "pre-empting" the *voir dire* of prospective jurors, but whether the examination he did give adequately dispelled the possibility that certain veniremen could not render "impartial" verdicts in these cases as a result of their exposure to extensive pre-trial publicity of another robbery trial in which the appellants were defendants. Both the federal[1] and the state[2] constitutions require, as a basic protection of the individual in a criminal case, trial by an "impartial jury." Among other things, this requirement means trial by a jury substantially free from the biasing effects of inflammatory pre-trial publicity. *Irvin v. Dowd,* 366 U.S. 717 (1961); *State v. Wakinekona,* 53 Haw. 574, 579-80, 499 P.2d 678, 682 (1972). While Rule 24(a) of the Hawaii Rules of Criminal Procedure authorizes the trial judge to conduct all or part of the "examination" of prospective jurors himself, thereby expediting the process of selecting a jury, that rule does not sanction an examination which is less than adequate constitutionally. *Compare United States v. Dellinger,* 472 F.2d 340, 370-77 (7th

---

[1] U.S. CONST. amends. VI & XIV.

[2] HAWAII CONST. art. I, § 11.

Cir. 1972), *cert. denied*, 410 U.S. 970 (1973) *with United States v. Eastwood,* 489 F.2d 818 (5th Cir. 1973).

In particular, the required examination of prospective jurors must be sufficiently detailed to discover whether they hold any prejudice as a result of exposure to pre-trial publicity. The scope of the examination should vary, of course, with the extent, quality, and timing of pre-trial publicity present in each case. In *United States v. Tropiano,* 418 F.2d 1069, 1079-80 (2d Cir. 1969), for example, the court held that the passage of approximately eight months' time between the last instances of adverse publicity and the date of trial legitimized the exclusive use in *voir dire* of a generalized inquiry into the impact of pre-trial publicity on prospective jurors. Similarly, this court has indicated that the amount and nature of pre-trial publicity directly determine the lengths to which a trial judge must go on *voir dire* to assess the possibility of prejudice resulting from that publicity. *State v. Wakinekona, supra* at 579-80, 499 P.2d at 682.

In the present cases, the factual showing of adverse pre-trial publicity made by the appellants is substantial. That publicity included dozens of newspaper articles as well as radio and television coverage concerning the trial, conviction and sentencing of Pokini, Moore and others for the so-called "Liberty House jewel robbery." Much of the coverage dealt with the testimony for the prosecution of Robert Low, an alleged accomplice of the appellants, whose evidence was also crucial to the prosecution's cases in the trial under review here. It included photographs of the appellants in handcuffs as well as reports of their alleged courtroom outbursts. One article in the Honolulu Advertiser, dated February 16, 1973, purports to cover Pokini's testimony in his own behalf at the Liberty House trial, and states in its lead paragraph:

James K. Pokini, 35, an ex-convict who police maintain plotted a number of major robberies and murders-for-hire on Oahu last year, took the witness stand in his own defense Thursday and presented the jury with the picture of a slow-witted oaf with barely enough intelligence to tie his own shoelaces.

The Honolulu Star-Bulletin of March 14, 1973, carried a front page story headlined as "LH Robbery Leader Gets Life," in which the trial judge in that case, also the trial judge in the present cases, is quoted as labelling Pokini the "moving force" in the robbery and in which Moore is quoted as stating "the judge had decided he [Moore] was guilty the second day of the trial."

Publicity concerning the Liberty House case began in early December, 1972 and lasted through mid-March, 1973 — only two weeks before the commencement of the present trial. It highlighted many of the same individuals involved in the present trial — Judge Chang, prosecution witness Robert Low, and the appellants, Moore and Pokini — and repeatedly suggested that Pokini was the leader of a "gang" responsible for several recent robberies and murders on Oahu.

Given the quantity, quality, and timing of this pre-trial publicity, it was incumbent on the trial judge to conduct a thorough-going examination of veniremen who indicated they had been exposed to it. Yet without exception the trial judge relied on perfunctory and generalized questions which elicited responses from these jurors solely on their subjective ability to ignore pre-trial publicity and be fair and impartial.[3] He expressly refused to allow inquiry into the extent and

---

[3] The questioning of prospective juror Tanaka, who was subsequently impanelled as a juror, is typical of the trial judge's approach to the publicity issue. It appears in the transcript as follows:

THE COURT: Miss Tanaka, as to news media matters which you have been exposed to concerning either of the two defendants, did any of that news media matter cause you to form an opinion regarding the guilt or innocence of the defendants in this case?

PROSPECTIVE JUROR TANAKA: No.

THE COURT: Do you now have formed in your mind an opinion as to the guilt or innocence of the defendants in this case?

PROSPECTIVE JUROR TANAKA: No.

THE COURT: Can you determine the guilt or innocence of the defendants in this case entirely upon the evidence produced in this case, and not let anything you may have seen, heard, or read about either of the defendants on prior occasions affect or influence your decision? Can you determine the guilt or innocence of the defendants only upon the evidence here, and not let these other matters affect or influence your decision?

PROSPECTIVE JUROR TANAKA: I will let the evidence that the Court gave me as — you know, on my final position.

THE COURT: In other words, only the evidence that you hear in this case?

PROSPECTIVE JUROR TANAKA: Right.

nature of the specific matters of publicity to which jurors had been exposed. Where pre-trial publicity is as extensive and as likely prejudicial as it was here, the constitutional right to an impartial jury requires examination into objective as well as subjective indicia of non-prejudice. In *Silverthorne v. United States*, 400 F.2d 627, 638 (9th Cir. 1968), *cert. denied*, 400 U.S. 1022 (1971), for example, the court held that extensive pre-trial publicity of the case compelled the trial judge on *voir dire* of prospective jurors to ascertain *"what* information the jurors had accumulated.'' (Emphasis in original.) Abbreviated inquiry into the jurors' subjective ability to be fair and impartial was inadequate, the court held.

> [W]hether a juror *can* render a verdict based solely on evidence adduced in the courtroom should not be adjudged on that juror's own assessment of self-righteousness *without something more.*

*Id.* at 639 (emphasis in original); *see* Note, *Voir Dire in Federal Criminal Trials: Protecting the Defendant's Right to an Impartial Jury*, 48 IND. L.J. 269, 274-75 (1973). The United States Supreme Court suggested the policy reasons behind the requirement of a more detailed inquiry into the possibility of prejudice from pre-trial publicity when it stated, in *Irvin v. Dowd, supra* at 728:

> No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father.

There is an essential difference between subjective and objective evidence of juror impartiality. The federal and state constitutions require the trial judge to attempt to adduce both where pre-trial publicity is as extensive as that preceding the trial of these appellants. *Silverthorne v. United States, supra.* The trial judge's express refusal to do so was reversible error because it foreclosed from his consideration crucial evidence of possible juror bias, thereby rendering fatally uninformed the exercise of his discretion not to excuse jurors for cause.

---

THE COURT: Very well. Mr. Pyun, based on the questions the Court has asked and the answers of the juror, it is not necessary to dwell any further on the pretrial publicity regarding this juror.

## II. THE TRIAL JUDGE'S MISCONDUCT
## TOWARDS DEFENSE COUNSEL

Essential to the ethic of fairness in our system of criminal jurisprudence is the responsibility of a trial judge to maintain the attitude and appearance of impartiality. The attitude of impartiality is necessary because in those matters entrusted to the trial judge's discretion fundamental fairness requires that he exercise that discretion guided solely by the facts and the law and not by his idiosyncratic pique against a party or counsel. *See, e.g., United States v. Dellinger, supra* at 387; *Territory v. Van Culin,* 36 Haw. 153, 158 (1942). The appearance of impartiality is essential for at least two reasons. First, it fosters respect for the law in general by offering visible evidence of the judiciary's integrity. And second, in a jury trial the appearance of judicial impartiality helps excise from those matters under the jury's consideration the judge's necessarily influential views on the merits of a party's position. *See, e.g., Quercia v. United States,* 289 U.S. 466 (1933); *Territory v. Peterson,* 23 Haw. 476, 484 (1916).

These considerations of fairness embrace a trial judge's treatment of counsel no less than of the parties themselves. An injudicious attitude held and expressed against an attorney is likely to color the judge's approach to matters in the case entrusted to his discretion as well as to impress the jury with the idea that he disfavors the attorney and, inferentially, the position the attorney represents. *See, e.g., United States v. Porter,* 441 F.2d 1204, 1213-16 (8th Cir.), *cert. denied,* 404 U.S. 830 (1971); *Davis v. State,* 242 Ark. 43, 411 S.W.2d 531, 536 (1967). So serious is the danger to a fair trial posed by a judge's unwarranted remarks demeaning defense counsel in the presence of the jury, that the law considers them errors of constitutional proportions. The constitutional rights of the defendant compromised by such conduct include the rights to due process of law, assistance of counsel in a criminal prosecution, and trial by an impartial jury. Once this type of error is identified, therefore, an appellate court must reverse a resulting conviction unless it can conscientiously conclude that "in the setting of [the] particular case [the error is] so

unimportant and insignificant that [it] may, consistent with the Federal Constitution, be deemed harmless.''*Chapman v. California,* 386 U.S. 18, 22 (1967). The error must be "harmless beyond a reasonable doubt,'' *id.* at 24, for if there is a " 'reasonable possibility' that the matter complained of might have contributed to the conviction," the error must give rise to a reversal. *United States v. Porter, supra* at 1215, *quoting Fahy v. Connecticut,* 375 U.S. 85, 86-87 (1963).

A crucial if not determinative consideration in assessing whether a constitutional error is harmless beyond a reasonable doubt is the strength of the prosecution's case on the defendant's guilt. *See Chapman v. California, supra* at 22. For example, *United States v. Porter, supra,* held constitutionally harmless a trial judge's criticisms of defense counsel in the presence of the jury only because the court viewed the record as a whole as presenting a "strong" case of guilt. 441 F.2d at 1215. *Accord, Kinna v. State,* 84 Nev. 642, 647, 447 P.2d 32, 35 (1968) ("the amount of misconduct necessary to reverse depends on how strong and convincing is the evidence of guilt"). *But see People v. Williams,* 40 A.D.2d 690, 336 N.Y.S.2d 267 (1972) (even where evidence of guilt is strong, misconduct towards defense counsel may warrant reversal).

In this connection, a case of guilt is never "strong" if evidence essential to conviction is the testimony of an alleged accomplice whose credibility the defendant subjects to severe attack. A trial judge's departure from the desired norm of impartiality in such a case is necessarily reversible error. *State v. Thomas,* 36 Ohio St. 2d 68, 303 N.E.2d 882, *aff'g* 33 Ohio App. 2d 7, 291 N.E.2d 780 (1973); *see Dale v. State,* 441 P.2d 476, 478 (Okla. Crim. 1968) ("in a close case, where the evidence is sharply conflicting, it is prejudicial error to rebuke counsel in the presence of the jury and . . . the same requires reversal").

The trial judge's hostile attitude towards defense counsel was evident from the inception of these cases. Prior to trial, for example, the appellant Pokini moved the trial judge to disqualify himself on the ground that he held a personal bias against Pokini. Pokini's counsel, Matthew Pyun, accom-

panied this motion and Pokini's supporting affidavit with a certificate of good faith, as required by HRS § 601-7(b). Although this certificate was limited to a statement of Pyun's good faith belief that Pokini honestly believed the matters contained in the motion and affidavit, the trial judge erroneously placed Pyun on the witness stand and challenged his good faith belief in the facts averred by Pokini in the affidavit. *Cf. Berger v. United States*, 255 U.S. 22 (1921). After a lengthy exchange as to the purpose of such a procedure, the trial judge suddenly and petulantly found that Pyun had not acted in "good faith," and thereupon dismissed the motion to disqualify.

This incident, and others out of the presence of the jury,[4] "reflect[ed] the trend of the court's mind during the trial." *Territory v. Van Culin, supra* at 158. Coupled with the many other instances of impropriety towards defense counsel

---

[4] During proceedings to settle jury instructions, for example, Mr. Pyun objected to a newly modified instruction proposed by the court on the ground that in its entirety it would tend to mislead the jury on the role of other participants in the alleged robbery. Although defense counsel had been given a copy of the instruction only that morning, and although the thrust of Mr. Pyun's objection was basically factual, the trial judge nonetheless openly berated Mr. Pyun for citing no legal authority in support of his position. In doing so he displayed once again an unfortunate tendency to confuse zealous advocacy with a challenge to his personal authority. He also revealed an obvious disdain for Mr. Pyun's professional ability:

Mr. Pyun, your position in connection with this instruction is totally without the keeping of a lawyer practicing in a trial court. The Court is asking you for the legal authority to support your position. You have none. The Court is asking you regarding your objection to a particular sentence so that the Court can improve this instruction, if possible.

The purpose of settling instructions is to come out with the best instruction, with the cooperation of all the minds involved in the trial. You have steadfastly refused to assist the Court; and instead of being willing to assist the Court, you have taken a contrary position, and you are not willing to assist the Court.

. . . .

Now, Mr. Pyun, the first thing you do whenever the Court takes a position to straighten things out, is to claim bias and prejudice.

Mr. Pyun, when you are ready to conduct yourself as a lawyer and present legal authorities for the Court to look at so that you can assist the Court the way you should — with legal authorities — when you give your assistance to the Court in trying to straighten out matters, then the Court will understand that you are trying to assist the Court. But you have never, during the course of this trial, presented one legal authority for all of the positions that you have taken; and the Court has asked you constantly: "What is your legal authority?" You have not presented any. The Court feels that your position in not presenting any legal authority is not assisting the Court as you should, as an officer of the Court.

committed by the trial judge in the presence of the jury, they reveal a deep and thorough-going bias against and contempt for the appellants' legal representation. The trial judge's state of mind and conduct in this regard were fundamentally at odds with his judicial responsibilities.[5]

Similarly, it cannot be said that the jury was not likely affected by the many vituperative outbursts against defense counsel the trial judge made in their presence. As the United States Supreme Court stated in *Quercia v. United States, supra* at 470:

The influence of the trial judge on the jury "is necessarily and properly of great weight" and "his lightest word or intimation is received with deference, and may prove controlling."

There follows a catalogue of some of the trial judge's criticisms of defense counsel in the presence of the jury. They go far beyond his "lightest word or intimation" on the quality of the defense.

During the opening statement to the jury by the appellant Moore's counsel, Michael Sherwood, the trial judge interrupted on his own motion several times to admonish Sherwood not to argue the law. When Sherwood objected to these interruptions,[6] the trial judge rejoined:

---

[5] The Canons of Judicial Ethics, adopted "as a standard of conduct for members of the Hawaii Judiciary" by Rule 19 of the rules of this court, provide in relevant part:

5. *Essential Conduct.* A judge should be temperate, attentive, patient, impartial, and, since he is to administer the law and apply it to the facts, he should be studious of the principles of the law and diligent in endeavoring to ascertain the facts.

. . . .

9. *Consideration for Jurors and Others.* A judge should be considerate of jurors, witnesses and others in attendance upon the court.

10. *Courtesy and Civility.* A judge should be courteous to counsel, especially to those who are young and inexperienced, and also to all others appearing or concerned in the administration of justice in the court.

. . . .

15. *Interference in Conduct of Trial.* . . .

Conversation between the judge and counsel in court is often necessary, but the judge should be studious to avoid controversies which are apt to obscure the merits of the dispute between litigants and lead to its unjust disposition. In addressing counsel, litigants, or witnesses, he should avoid a controversial manner or tone.

[6] *See* CANONS OF JUDICIAL ETHICS No. 15, which provides, in part, that a trial judge

When you conduct yourself in a competent manner, the Court will not interrupt you, Mr. Sherwood. Please proceed competently . . . . And please conduct yourself in a proper manner as a lawyer. . . .

In response to an objection by Mr. Pyun during Mr. Sherwood's opening statement, the trial judge also announced, for the jury to hear:

[E]very time you speak up against the Court when the Court has said something, the Court will have a comment against you, Mr. Pyun. I want you to know that, Mr. Pyun.[7]

Later, while engaged in his own opening statement, Mr. Pyun suggested to the jury that if he seemed "angry" during the trial the jury should not hold it against his client. Though there was no objection to this language by the prosecution, the trial judge interjected:

The court would like to request counsel if he would kindly leave his angry self out of the courtroom from here on out. The court will appreciate it.

Upon Mr. Pyun's objection to the tenor of this comment, the trial judge responded:

Very well. Mr. Pyun, you keep on rising and keep on making statements. The court hopes that one day you will learn not to keep on rising, but just let matters lie.

In the course of Mr. Sherwood's cross-examination of a key prosecution witness, alleged accomplice Philip Sylva, the trial judge ruled inadmissible questions concerning Sylva's involvement in a murder unconnected with the case. The following colloquy then occurred:

---

should avoid interruptions of counsel in their arguments except to clarify his mind as to their positions, and he should not be tempted to the unnecessary display of learning or a premature judgment.

[7] Compare State v. Phillips, 59 Wash. 252, 257, 109 P. 1047, 1049 (1910), where the Supreme Court of Washington held that the following comments of the trial judge to defense counsel in the presence of the jury constituted prejudicial, reversible error:

"Mr. Fitzgerald: I expect to connect this [evidence], your honor. Judge: You can make a lot of declarations. Mr. Fitzgerald: I except to what the court says. Judge: Every time the court speaks take an exception. Mr. Fitzgerald: I will. Judge: Every time the court bats his eye take an exception."

*Mr. Sherwood:* Is the Court precluding me totally from going into matters which might have relevance to the character and credibility of this man's testimony?

*The Court:* Mr. Sherwood, if you believe that it has standing you should proceed as a lawyer in this case. The Court has already sustained the objection. If you do not understand the area you are in the Court suggests that you think about it.[8]

It is clear that these remarks in the presence of the jury, conveying the trial judge's contemptuous opinion of the capabilities of defense counsel, were palpably improper.[9] As the Court of Appeals for the Seventh Circuit held on a record reflecting similar improprieties committed by a trial judge, "gratuitous implications of ineptness, before the jury, especially with the added impact of sarcasm, were not justified," and constituted reversible error. *United States v. Dellinger, supra* at 387-88.

The prejudicial nature of the trial judge's misconduct towards defense counsel in accentuated by the factual record on the question of the appellants' guilt. It shows that the prosecution's case turned largely on the testimony of Robert Low and Philip Sylva, two alleged participants in the robbery who had been granted immunity from prosecution in return for their testimony against Moore and Pokini. The defense rested for the most part on extensive challenges to the credibility of these witnesses. Where the credibility of alleged accomplice testimony is a key issue, it can never be said, as it was in *United States v. Porter, supra* at 1215, that the case of guilt is "strong."*State v. Thomas, supra.* Indeed, the lengthy deliberations of the jury in these cases, during which at one point the foreman indicated that the jury was deadlocked,

---

[8] Compare Dale v. State, 441 P.2d 476, 477 (Okla. Crim. 1968), where the court reversed a conviction for a trial judge's reprimand of defense counsel in the presence of the jury. Defense counsel had objected to certain questions asked of his client during cross-examination by the prosecution, and the trial judge responded by asking if counsel "underst[ood] the difference" between direct examination and cross-examination.

[9] *See, e.g.,* Davis v. State, 242 Ark. 43, 411 S.W.2d 531, 536 (1967); State v. Hicks, 438 S.W.2d 215, 220-21 (Mo. 1969); Dale v. State, 441 P.2d 476 (Okla. Crim. 1968).

lend even more credence to the argument that the cases were "close."

This court stated, in *Territory v. Van Culin, supra* at 159, quoting *Sharpton v. State,* 1 Ga. App. 542, 548-49, 57 S.E. 929, 932 (1907):

> Every practitioner knows how eagerly alert jurors are to every utterance from the bench, and how sensitive is the mind of the juror to the slightest judicial expression.

The trial judge's short-tempered abuse of defense counsel in the presence of the jury, exacerbated by repetition, "clings to the mind like a tattoo on the epidermis." *Carlile v. State,* 129 Fla. 860, 865, 176 So. 862, 864 (1937). Counsel's efficacy in the eyes of the jury could have been diminished by the trial judge's remarks; and in a trial such as this, where the entire defense is premised on counsel's ability to impeach the credibility of accomplice testimony, such conduct from the bench is especially devastating. The five members of this court are unanimous in their disapproval of the trial judge's remarks — the only difference among us is whether those remarks were reversible or non-reversible error. However, since these cases are to be reversed on other grounds anyway, hopefully the trial judge will draw guidance from our disapproval should he preside at the retrial of these cases.

### III. *EX PARTE* COMMUNICATIONS BY THE TRIAL JUDGE WITH THE JURY DURING ITS DELIBERATIONS

On three occasions during the jury's deliberations the trial judge sent written communications to the jury without first reconvening the court and affording the appellants and their counsel an opportunity to be present. One was in response to a written request from juror Baugh to be excused from jury duty[10] as well as to a report from the bailiff that there was an open dictionary in the jury room.[11] The other two

---

[10] The matter of juror Baugh's request to be excused from jury duty is treated fully in part IV of this opinion.

[11] The trial judge's written message read as follows:

The Court hereby instructs the Jury that the jurors are not to look at any books whatsoever, including dictionaries, which may be in the jury room. Any word that

were in response to written questions from the jury seeking definitions of the concepts "accessory before the fact," "scene of the crime," and "aggravated assault upon a person."[12]

A majority of this court — consisting of Justice Menor, Justice Ogata, and myself — agree that the trial judge's *ex parte* communications with the jury during their deliberations were reversible error. *See State v. Irebaria,* 55 Haw. 353, 358, 519 P.2d 1246, 1250 (1974) (dicta). A defendant in a criminal case has a procedural and constitutional[13] "right to be present whenever the court communicates with the jury." *Bustamante v. Eyman,* 456 F.2d 269, 272 (9th Cir. 1972); *see* HAWAII R. CRIM. P. 30(d). Because this right is of constitutional dimensions, moreover, at the very least it is enforceable on appeal by a rule requiring reversal unless the prosecution shows that a violation of the right was harmless beyond a reasonable doubt.[14] *See United States v. Dellinger, supra* at 377-80; *United States v. Schor,* 418 F.2d 26, 30 (2d Cir. 1969).

Apart from the question whether the *ex parte* judge-jury communications were "harmless error," we note at the outset a Hawaii statute and a decision of this court which *mandate* reversal of the appellants' convictions. HRS § 635-43, effective during the trial of these cases,[15] provides as follows:

the jurors do not understand and desire to have a definition of, the Jury is to request such definition be given by the Court. Should such a request become necessary, please phrase your question in the following manner:

"Will the Court please define for the Jury the following word: ___."

That is all the message should say — nothing about whether the word is a legal word or not.

No juror is to be excused from jury duty at this time. The Court requests that all jurors do their best to deliberate as instructed by the Court.

[12] The trial judge transmitted to the jury verbatim written copies of the instructions touching on these concepts which he had previously read to the jury in his initial charge.

[13] U.S. CONST. amends. VI & XIV; HAWAII CONST. art. I, § 11.

[14] The policy behind and phrasing of the rule of harmless constitutional error "cast[] on someone other than the person prejudiced by [the error] a burden to show that it was harmless." Chapman v. California, 386 U.S. 18, 24 (1967). In the area of *ex parte* judge-jury communications, the burden is on the *prosecution* to show that the communications were harmless beyond a reasonable doubt. Bustamante v. Eyman. 456 F.2d 269 (9th Cir. 1972).

[15] The statute has since been repealed, effective July 1, 1973, by L. 1972, ch. 89, § 2B(n).

Unless the parties to the cause on trial either in person or through their attorneys, shall file therein their written consent that the court may charge the jury orally, it shall be the duty of the court, except as provided in section 231-25, to reduce in writing and read its charge to the jury; and the manuscript of such charge, signed by the court, shall be filed in the cause, and shall constitute a part of the record thereof. *Whenever, and as often as the court shall depart from such duty, either party to such suit shall be entitled as a matter of right, to demand and have granted a new trial of such cause.*[16]

(Emphasis added). The italicized portion of this statute suggests that the degree of prejudice resulting from an improper judge-jury communication is irrelevant to the right to a new trial. This interpretation is firmly supported by *The Great Wilno v. E. K. Fernandez*, 34 Haw. 603 (1938), a civil case construing the precisely equivalent predecessor to HRS § 635-43, RLH 1935, § 3745. In that case, the court concluded that the submission of an additional written instruction to a deliberating jury, without first convening the court, is reversible per se under the statute unless both parties consent in writing to such a procedure. The opinion, applicable a fortiori to a criminal case, speaks directly to the "harmless error" argument. It reasons as follows:

The procedure followed by the court in this case is in direct violation of the terms of the statute. The statute makes it the duty of the court, in the absence of the written consent of the parties or their attorneys, to reduce to writing and read its charge to the jury. The charge in question was reduced to writing but was not read to the jury, and the record shows that neither the parties nor their attorneys gave their written consent to the procedure followed. The statute provides that the parties shall be entitled, as a matter of right, to a new trial whenever the court shall depart from the duty imposed upon it by the statute.

[16] The text quoted is that of RLH 1955, § 231-24, since the printers of the Hawaii Revised Statutes inadvertently omitted certain words of the statute.

Some courts hold that the procedure here followed, though error, is harmless where the instruction given correctly states the law but none of the opinions examined by us disclose statutory provisions similar to the provisions of our statute on the subject. We are not concerned with the wisdom of the statute. That is a matter for the legislature. The statute, by prescribing what the consequence of a departure by the court from its duty shall be, makes it mandatory that we sustain the exception to the giving of the instruction in question in the manner herein set forth and makes it unnecessary for us to consider the substance of the instruction in question.

34 Haw. at 606.

*The Great Wilno* does not concern itself with the demands of a bothersome "legal technicality" devoid of substance. The decision is solidly based in considerations of policy. It recognizes what other courts have recognized without the aid of a legislative declaration such as HRS § 635-43 — the right of a litigant and his attorney to be present at that crucial state of a case in which the judge communicates with a deliberating jury on matters of substance is far too important to leave to the vagaries of the "harmless error" rule. *See, e.g., Shields v. United States,* 273 U.S. 583 (1927); *People v. Harris,* 43 Mich. App. 746, 204 N.W.2d 734 (1972). "Harmless error" analysis of an *ex parte* judge-jury communication neglects a significant reason underpinning the requirement that a judge afford the parties an opportunity to be present *prior* to the communication — the importance of allowing the parties an input into the trial judge's thinking so that the resulting communication with the jury will be the best one possible and not just one that an appellate court can subsequently declare "harmless." *See Fillippon v. Albion Vein Slate Co.,* 250 U.S. 76, 82 (1919);[17] *United States v. Dellinger, supra* at 380 (ostensibly applies "harmless error" test, but concludes that *ex parte*

---

[17] The United States Supreme Court's observations regarding this question in *Fillippon* are instructive:

It is not correct, however, to regard the opportunity of afterwards excepting to the instruction and to the manner of giving it as equivalent to an opportunity to be present during the proceedings. To so hold would be to overlook the primary and essential function of an exception, which is to direct the mind of the trial judge to

judge-jury communication was error because "the suggestions of counsel might well have been helpful and led to a different exercise of discretion").

Because HRS § 635-43 has been repealed since the appellants' trial, *see* note 15 *supra*, it necessarily has no applicability to future trials. In appeals from future trials, our analysis of *ex parte* judge-jury communications will look to whether they were harmless beyond a reasonable doubt. *See* note 14 *supra*.

Indeed, even if we apply only that standard to the present cases, reversal is required. We do not find harmless beyond a reasonable doubt the trial judge's submission to the jury, during deliberations, of written copies of three instructions, previously given orally, dealing with the concepts "accessory before the fact," "scene of the crime," and "aggravated assault upon a person." While there is authority in this state to support the provision of an *entire set* of unmarked instructions to a deliberating jury in a criminal case, *State v. Peters*, 44 Haw. 1, 6, 352 P.2d 329, 332 (1959), the trial judge's procedure of transmitting piecemeal some instructions to the exclusion of others was unprecedented and highly prejudicial. There were dozens of instructions in these cases, dealing with such important matters to the defense as the presumption of innocence, the right of an accused not to testify, and the authority of the jury to view with special skepticism the testimony of alleged accomplices granted immunity from prosecution. As to these instructions, the jury was forced to rely on its memory of the previous oral charge. But instructions on the liability of an accessory and the elements of aggravated assault were afforded the jury by the trial judge in *written* form. Inherent in this procedure was the insidious danger that the jury would place undue focus and emphasis on the written instructions[18] — a danger heightened by the

---

the point in which it is supposed that he has erred in law, so that he may reconsider it and change his ruling if convinced of error, and that injustice and mistrials due to inadvertent errors may thus be obviated.
250 U.S. at 82.

[18] Unfortunately, the jury was also forced to rely on its memory for the substance of the following instruction, given it orally several days before:

unusually long three and one-half day period of jury deliberations.

### IV. UNAUTHORIZED COMMUNICATIONS BETWEEN THE
### BAILIFF AND THE JURY DURING JURY DELIBERATIONS

After the jury had been deliberating for over three days, the trial judge received the following note from juror Alma Baugh:

> Message to the Court. I have been accused by the Bailiff of not doing my job properly. Therefore I ask to be excused from jury duty.

The trial judge refused to excuse her, however, *see* note 11 *supra,* and a few hours later the jury returned verdicts of guilty against the appellants. At a post-verdict "hearing," ostensibly to ascertain the facts underlying juror Baugh's message and the possibility that the appellants had been prejudiced, the trial judge asked juror Baugh a single question of substance:

> *THE COURT:* Mrs. Baugh, the Court would like to at this time inquire whether anything that is contained — the subject matter of what is contained in this message, did it in any way prevent you from being able to continue as a fair and impartial juror in this case?
> *JUROR BAUGH.* No. It did not.

The judge did not ask for details of the incident with the bailiff. Nor did he inquire whether juror Baugh had talked with *other* jurors about the incident, and if so, whether they had demonstrated concern over it. Only after an examination of juror Baugh by Mr. Sherwood did the facts of the event begin to emerge: as the jurors adjourned for lunch on the third day of their deliberations, the court's bailiff stated to juror Baugh, "If you would put down your knitting, you might be able to do your job." After foreclosing further inquiry by Mr.

---

If in these instructions any rule, direction or idea is repeated or restated, no emphasis thereon is intended and none must be inferred. You are not to single out any particular sentence, or any specific point or instruction, and ignore the others, but you are to consider all the instructions as a whole and to regard each in the light of all the others.

Sherwood into the impact of this confrontation with the bailiff on juror Baugh's state of mind, the trial judge found that juror Baugh had properly "done the job."

Trial by jury is considered fundamental to our system of criminal justice. The law therefore zealously protects the efficacy of the right to jury trial by erecting a strong presumption of prejudice when the integrity of jury deliberations has been compromised by unauthorized contact with non-jurors. *See, e.g., Remmer v. United States,* 347 U.S. 227, 229 (1954); *Mattox v. United States,* 146 U.S. 140, 148-50 (1892). While the presumption of prejudice is not conclusive, "the burden rests heavily *on the Government* to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Remmer v. United States, supra* at 229 (emphasis added). The outside influence need not touch directly on the guilt or innocence of the defendant to trigger the presumption of prejudice — it is enough that during the crucial period of jury deliberations there was a private communication bearing even remotely on the trial or the jury's functions in it. *See, e.g., Gold v. United States,* 352 U.S. 985 (1957) (per curiam), facts reported in 237 F.2d 764, 775 (D.C. Cir. 1956) (Bazelon, J., dissenting); *Laine v. State,* Ind. App., 289 N.E.2d 141 (1972).

The task of the trial judge at the hearing required by an unauthorized communication with the jury is to determine, first, what actually took place, and second, whether the impact of the communication "was clearly not prejudicial" to the defendant. *United States v. Betner,* 489 F.2d 116, 119 (5th Cir. 1974). In addition, the judge must afford a "full hearing at which counsel [are] free to introduce any evidence relevant to the alleged conversation." *Morgan v. United States,* 399 F.2d 93, 97 (5th Cir. 1968), *cert. denied,* 393 U.S. 1025 (1969). When measured against these standards, the procedure followed by the trial judge was demonstrably inadequate in many respects.

(1) *The trial judge improperly attempted to discharge the entire burden of proof placed on the State.* As *Remmer v. United States, supra* at 229, mandates, the burden is on the *"Government* to establish . . . that . . . contact with the

juror was harmless." (Emphasis added.) *See Badgwell v. State*, 418 P.2d 114, 117 (Okla. Crim. 1966) (showing of unauthorized communication "automatically shifts the burden upon the state to show non-prejudice by competent evidence"). Yet the State offered no evidence at the hearing, choosing instead to rely on the purported "showing" of nonprejudice made by the trial judge himself. While it is within the discretion of a trial judge to examine witnesses "to bring out needed facts which have not been elicited by the parties," this discretion is necessarily circumscribed by his responsibility "not [to] assume the role of an advocate or of a prosecutor." E. CLEARY, MCCORMICK'S HANDBOOK OF THE LAW OF EVIDENCE § 8, at 12, 13 (2d ed. 1972). I find it clearly improper for the trial judge to have attempted to carry the State's *entire burden of proof* in this hearing when it was his primary responsibility to sit in judgment on the facts. *See* CANONS OF JUDICIAL ETHICS No. 15.

(2) *There was insufficient evidence of non-prejudice from the bailiff's remark.* Even if it is assumed that the trial judge properly attempted to discharge the State's entire burden of proof, the record of the hearing is woefully inadequate to this end. Several circumstances combined to make the remark of the bailiff to juror Baugh particularly dangerous to the appellants. First, the jury had been deliberating for the lengthy period of three days when the remark was made. Second, they had earlier indicated the presence of a deadlock in a message to the court. Third, the comment itself — "If you would put down your knitting, you might be able to do your job" — on its face was an attempt by the bailiff to accelerate the jury's deliberations at a time when the jury was already burdened in this regard by the very length of their previous deliberations.[19] Fourth, the remark by the bailiff arguably singled out juror Baugh as a "recalcitrant obstructionist" and thus may have pressured her *personally* to accede to the

---

[19] *Cf.* Lambert v. State, Ind. App., 306 N.E.2d 115, 118 (1974) (finding harmless a bailiff's question of a deliberating jury whether they would be finished by that afternoon; "[w]e find no intimidation or threat in this simple inquiry which would *cause a jury to accelerate their deliberations"*) (emphasis added).

desires of the majority.[20] Finally, the *actual impact* of this remark on juror Baugh was to disgruntle her to the point of requesting relief from further jury duty. Yet despite these circumstances, the only indication on the record that the bailiff's remark left no prejudicial impact was juror Baugh's statement of self-assessed subjective impartiality in response to the trial judge's single question, whether the bailiff's remark "in any way prevent[ed] you from being able to continue as a fair and impartial juror in this case." *Cf.* part I of this opinion. This does not constitute discharge of the "heavy" burden on the government to show an absence of prejudice. *Remmer v. United States, supra* at 229. It is not "clear, distinct, concise and convincing proof" that the remark of the bailiff had no impact on the jury's deliberations. *Scott v. State,* 448 P.2d 272, 275 (Okla. Crim. 1969). The trial judge's generalized request of juror Baugh to assess her own subjective "impartiality" for his benefit, after she had just voted to convict the appellants, invited its own answer. *Cf. Irvin v. Dowd, supra* at 728. Obviously a more probing inquiry into the incident and its impact on juror Baugh was needed, unless, as the record suggests, the trial judge was bound to protect the jury's verdicts of guilty at all costs. I note finally that the trial judge omitted entirely any inquiry into the impact, if any, that the bailiff's remark had on the jurors *other* than juror Baugh. Whether any other jurors were "accelerated" in their deliberations by the bailiff's expression of impatience the trial judge evidently did not care to know. *Cf. Lambert v. State,* Ind. App., 306 N.E.2d 115, 118 (1974).

(3) *Appellants were denied a full hearing on the impact of the bailiff's remark.* The hearing required by *Remmer v. United States, supra,* necessarily includes a meaningful opportunity for the defense to adduce evidence of prejudice stemming from an unauthorized contact with the jury. *Morgan v. United States, supra.* This is especially important

---

[20] *Cf.* Gregg v. State, 43 Ala. App. 538, 541, 195 So.2d 803, 806 (1966) (finding harmless a bailiff's remark to the jury that the case was costing the county money; "[t]here was nothing [in this remark] to impute obstinacy, stupidity, or mala fides to the jury, or to any of them; *no singling out of a minority as recalcitrant obstructionists")* (emphasis added).

where the initial showing of non-prejudice is as fragile as it was here. Yet the trial judge consistently foreclosed inquiry by the defense into juror Baugh's state of mind — the principal issue in the hearing. He expressed his erroneous understanding of the purpose of the inquiry when he stated:

> This is only as to what transpired between the juror; and, if necessary, whether the juror was not able to function as a juror. That's all.

Of course, the applicable legal standard is not whether the outside influence rendered juror Baugh "not able to function as a juror," but whether there was a *reasonable possibility* that it influenced her or other jurors in their deliberations. *Cf. Paz v. United States*, 462 F.2d 740, 745-46 (5th Cir. 1972), *cert. denied*, 414 U.S. 820 (1974). To this end, the defense asked, and *sua sponte* was foreclosed from pursuing by the trial judge, questions touching on juror Baugh's level of decision or indecision on the question of guilt at the moment the bailiff accused her of not doing her job properly.[21] If her response to these questions had indicated indecision, there would have been objective evidence that the remark *did* affect her thinking in ways that her simple response to the trial judge's general question on "impartiality" did not reveal. By disallowing this line of inquiry, the trial judge rendered the hearing exceedingly one-sided and disabled the appellants from pursuing the reasonable possibility of prejudice to them resulting from the incident between the bailiff and juror Baugh.

---

[21] Mr. Sherwood asked the following two questions of juror Baugh, both of which were disallowed by the trial judge:

(1) "Had you at that point reached a decision in your own mind as to what your verdict was going to be?

(2) "Mrs. Baugh, were you the individual who was reading a dictionary?"

Both questions were highly relevant to the ostensible purpose of the hearing. The first sought to discover directly whether juror Baugh was indecisive on the question of guilt and hence whether the remark of the bailiff might have pressured her to reach agreement with those jurors already convinced of guilt. The second was aimed indirectly at the same end, insofar as use of the dictionary present in the jury room might have indicated juror Baugh was troubled about the application of the law to the facts of these cases.

## V. CONCLUSION

A majority of this court has voted to reverse the appellants' convictions and sentences. Part III of this opinion, in which all three members of the majority concur, and the views of the individual members of the majority, articulated throughout this opinion and in the separate opinion of Justice Menor, represent the rationales for that result.

Reversed and remanded for new trial.

*Matthew S. K. Pyun, Jr. (Ikenaga* and *Pyun* of counsel) for defendant-appellant James Pokini.

*Michael R. Sherwood (Hart, Sherwood, Leavitt, Blanchfield* and *Hall* of counsel) for defendant-appellant William Moore.

*Charlotte E. Libman,* deputy prosecuting attorney *(Lawrence S. Grean,* deputy prosecuting attorney, with her on the briefs, *Barry Chung,* prosecuting attorney, of counsel) for plaintiff-appellee.

### CONCURRING OPINION OF MENOR, J.

I concur in the reversal of the defendants' convictions and sentences in the court below, and join in the order of remand for new trial.

### I

I am in accord with Part III of Mr. Justice Levinson's opinion and agree with him that the trial judge's communications with the jury in the absence of the defendants and their counsel constituted reversible error.[1]

### II

I also agree with my brother Justice that the conduct of the

---

[1] In fairness to the trial judge it should be pointed out that his primary motivation was to spare the jury, the defendants, and counsel the inconvenience of having to reconvene each time the jury posed a question. Mere inconvenience, however, should never be a prime consideration in a criminal trial.

voir dire examination of prospective jurors in the area of pre-trial publicity was inherently defective. My reasons, however, are not altogether the same, for I am not entirely convinced that the nature and extent of the pre-trial publicity in this case warrants the application of *Silverthorne v. United States*, 400 F.2d 627 (9th Cir. 1968), *cert. denied* 400 U.S. 1022 (1971).

I am satisfied that the voir dire examination of the prospective jurors, viewed in its entirety, was adequate for the purpose of ascertaining whether or not a prospective juror was qualified to serve. But in focusing the scope of its inquiry solely upon whether or not the prospective juror was qualified to sit in judgment, the trial court completely overlooked, and consequently ignored, the other equally basic function of the voir dire examination. In *Choy v. Otaguro*, 32 Haw. 543 (1932) this court pointed out that the purpose of the voir dire is not simply to aid the presiding judge in determining whether a juror should be excused for cause but also *to enable a party to exercise his right of peremptory challenge intelligently. Accord, Carr v. Kinney*, 41 Haw. 166 (1955). To accomplish this latter purpose, a party must be afforded ample opportunity, albeit within reasonable limits, to inquire into those matters which might have a tendency to unduly influence a juror in the discharge of his duties but whose answers on the voir dire may not be sufficient to support a challenge for cause.

The right to challenge peremptorily is deeply ingrained in American jurisprudence. *Swain v. Alabama*, 380 U.S. 202, 218-219 (1965). In Hawaii it is guaranteed a criminal defendant by rule and by statute. H.R.Cr.P., Rule 24(b); HRS § 635-29 (Supp. 1973). It is "one of the most important rights secured to the accused," *Pointer v. United States*, 151 U.S. 396, 408 (1894), and "[t]he denial or impairment of the right is reversible error without a showing of prejudice." *Swain v. Alabama, supra* at 219.

The voir dire examination of Juror Takara is particularly illustrative of the unduly restrictive inquiry allowed defense counsel by the trial judge.[2] It is also a clear indication of the

---

[2] Portion of voir dire examination of Juror Takara:

MR. PYUN: Mr. Takara, do you remember what you read about Mr. Pokini?

trial judge's erroneous concept of the functions of the voir dire examination. The defendants should have been permitted to inquire into the nature and extent of the prospective juror's exposure to pre-trial publicity, if only to enable them to exercise their peremptory challenges intelligently.

The trial judge undoubtedly was properly concerned about the prejudicial effect these disclosures might have had upon the other prospective jurors. This problem could have been obviated by individual voir dire outside of the presence of the other jurors, as was done in the case of prospective juror Pekelo. Defense counsel's requests, however, for that type of procedure failed to meet with the trial court's approval.

The refusal of the trial judge to allow defense counsel to inquire into the nature and extent of the prospective jurors' exposure to pre-trial publicity was a serious impairment of the defendants' right to exercise their peremptory challenges intelligently. This constituted reversible error. *Cf. Swain v. Alabama, supra; Lewis v. United States,* 146 U.S. 370 (1892).

Where external considerations, such as adverse pre-trial publicity, may give rise to a real possibility of unconscious bias, the trial judge should be mindful of the admonition of the court in *State v. Van Duyne,* 43 N.J. 369, 385-6, 204 A.2d 841, 850 (1964), *cert. denied* 380 U.S. 987 (1965):

> [The defendant expresses ] grave doubt that jurors who are subjected to pretrial publicity *seriously adverse to a defendant's interests* can efface it altogether from their conscious and unconscious minds, no matter how hard they try to do so. The law must be sympathetic to that viewpoint, and must make the sympathy meaningful in a

PROSPECTIVE JUROR TAKARA: Generally, sir.

MR. PYUN: Can you tell me what you read?

THE COURT: The Court will disallow the question.

MR. PYUN: Well, I'd like to go into that area; the Court will disallow it, so I might as well sit down.

THE COURT: The Court has already inquired of the juror, and the juror has indicated that he has formed no opinion; nor would anything that he has read in the past influence his decision; and therefore, he is qualified.

Very well. Mr. Takara has been passed for cause insofar as the Court is concerned; and so long as you have no other questions, Mr. Pyun, the Court will proceed.

practical world of public trials. This can be done only by requiring trial judges to analyze and evaluate carefully the words, attitude and demeanor of the juror when he asserts an impartial mind and one which is free from prejudice regardless of the improper newspaper publicity. If, in spite of the disavowal, the trial court has any lingering doubt about the juror's capacity for impartiality, he should be excused from service. (Emphasis added)

III

I agree with Mr. Justice Levinson that it is essential to a fair trial that the presiding judge endeavor at all times to maintain an attitude and appearance of fairness and impartiality. Where I part company with my brother Justice is the degree to which the trial judge here has been subjected to criticism for his alleged misconduct towards defense counsel and the conclusion drawn that such conduct might have infected the verdicts.

While not offered as a justification for the trial judge's conduct, I would suggest that a fair reading of the record will reveal that it was not all a one-way street.[3] I would simply

---

[3] The following are excerpts from the record containing some of the so-called "vituperative" outbursts of the trial judge which were taken out of context:

THE COURT: Mr. Sherwood, just present your opening statement. This is argument now.

MR. SHERWOOD: This is my opening statement, your Honor.

THE COURT: It's not an opening statement. You are now dwelling on the same thing that the Prosecutor dwells on regarding law, which was objected to, and which was sustained.

MR. PYUN: Your Honor, I will object to the Court's remarks relating to my objections. Mr. Grean, when I objected, said, "The law is" — and I objected at that point. And I'd like to make it clear that that is a clear —

THE COURT: Mr. Pyun, if you wish to — every time you speak up against the Court when the Court has said something, the Court will have a comment against you, Mr. Pyun. I want you to know that, Mr. Pyun.

MR. PYUN: Very well, your Honor. You have your right to do that. But I would like the Court to know that I feel compelled to stand up and set the record straight every time the Court chooses to twist my words and use it against my client, or against the defense in this case.

THE COURT: Mr. Pyun, the Court is not twisting your words. You objected because the Prosecutor was arguing law. The court sustained your objection and requested the Prosecutor not to argue law, just to present a bird's-eye view of what he intends to present.

remind the trial court that dignity and orderly procedure in the courtroom can usually be maintained by firmness, fairly and judiciously asserted. Conduct extraneous to the actual determination of the guilt or innocence of the accused often-times obscures the personal integrity and inherent fairness and impartiality of the trial judge. When such conduct has the further effect of undoing the results of an otherwise ably and competently regulated trial, justice must invariably suffer thereby. This is not to suggest, however, that overzealous-ness of counsel, which exceeds the bounds of propriety, should be lightly regarded.

Having viewed the record in its entirety, I am not satisfied that it can reasonably be said that the conduct complained of here infected the verdicts. In our appellate review of cases tried before a jury we should not so easily assume that its members stand continually ready to violate their oaths as jurors on the slightest provocation. *State v. Hashimoto*, 46 Haw. 183, 377 P.2d 728 (1962).

Experience and study indicate . . . that the composite jury

---

And at this time, Mr. Sherwood, that is not what you're doing. So please stick to the opening statement.

\* \* \* \* \*

THE COURT: All right. Present your opening statement.

MR. SHERWOOD: Your Honor, may I object, for the record, to the Court continually interrupting me? Mr. Grean is a competent and aggressive Pros-ecutor, your Honor. He has not stood up and objected. The Court is supposed to be neutral, your Honor. It's hard enough being a defense attorney with a compe-tent Prosecutor in the case; and I object to the Court's constant interruptions, your Honor.

THE COURT: When you conduct yourself in a competent manner, the Court will not interrupt you, Mr. Sherwood. Please proceed competently, within the terms of an opening statement.

MR. SHERWOOD: Your Honor, I would like to object to those remarks. And again I point out that the Court is acting sua sponte. Mr. Grean represents the State in this case, your Honor. He can object if he feels there is something objectionable. And if he doesn't object, I assume that there is nothing objection-able.

THE COURT: Mr. Sherwood, the Court would like to have you understand that the Court is not simply bound by what lawyers do in court. The Court can, on its own motion, move. And please conduct yourself in a proper manner, as a lawyer, and stick to the purpose for which you now have the floor; and that is, to present an opening statement. No arguments on the law, Mr. Sherwood.

possesses far more intelligence than most judges and lawyers credit to it. The ability to fairly weigh the evidence, to discard irrelevancies, to assess equity and to ignore prejudicial comment of lawyers and judges alike is the underlying strength of the jury system. *United States v. Porter*, 441 F.2d 1204, 1215 (8th Cir. 1971).

Finally, I would suggest that the following reminder by Mr. Justice Frankfurter in his concurring opinion in *Johnson v. United States*, 318 U.S. 189, 202 (1943), is always apropos on appellate review:

In reviewing criminal cases, it is particularly important for appellate courts to re-live the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and of procedure. To turn a criminal appeal into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.

For the reasons stated in Parts I and II of this opinion, however, I would reverse.

DISSENTING OPINION OF KOBAYASHI, J.
WITH WHOM RICHARDSON, C.J., JOINS

I dissent.

The appellants allege the following:

I. That the trial court abused its discretion in pre-empting appellants' voir dire of prospective jurors in the area of pre-trial publicity.

II. That the conduct of the trial court toward defense counsel, in the presence of the jury, denied appellants a fair trial.

III. That the communications between the trial judge and the jury during deliberation, without the presence of defendants or defense counsel, denied appellants a fair trial.

IV. That the comment of a bailiff of the court directed at a juror denied appellants a fair trial.

PRE-EMPTION OF APPELLANTS' VOIR DIRE OF
PROSPECTIVE JURORS IN THE AREA OF
PRE-TRIAL PUBLICITY

The question herein is whether the trial court abused its discretionary powers in asking questions of prospective jurors to its own satisfaction with regard to the ability of each juror, who had heard of or read about the appellants through the news media or other sources, to render an impartial verdict.

A review of the record reveals that of the twelve jurors who were finally selected to sit on the case, three indicated that they had heard of or read about the appellant Pokini in the newspaper or some other form of news media.

On appellants' voir dire of the three jurors, prior to their selection as jurors, appellants sought to elicit of the jurors detailed responses of what the jurors heard or read concerning the appellants. The trial court refused to permit the asking of such questions and the replies thereof in the presence of the other prospective jurors. The trial court stated that the appellants may conduct such a voir dire individually of the jurors out of the presence of all the other prospective jurors, if necessary, at a proper time. The trial court then conducted its own voir dire of the three jurors relative to the pre-trial publicity to determine whether or not the said jurors were prejudicially affected by the pre-trial publicity and further to determine whether "there is a necessity to have individual voir dire." The record does not reflect "a necessity to have individual voir dire" nor does the record show a demand by the appellants, after the trial court's voir dire and prior to the exercise of appellants' peremptory challenges, for an individual voir dire on the ground of necessity. I am of the opinion that the trial court's voir dire of the three jurors properly covered the question inherent in pre-trial publicity. I do not believe the pre-trial publicity in this case warrants the application of *Silverthorne v. United States*, 400 F.2d 627 (9th Cir. 1968), *cert. denied*, 400 U.S. 1022 (1971).

On the question of the propriety of the procedure followed by the trial court, Rule 24(a) of the Hawaii Rules of Criminal

Procedure (HRCrP) reads:

> (a) Examination of Jurors. The court shall permit the parties or their attorneys to conduct the examination of prospective jurors or shall itself conduct the examination. In the latter event the court shall permit the parties or their attorneys to supplement the examination by such further inquiry as it deems proper.

Rule 24(a) gives the trial judge broad powers and discretion into what may be covered on voir dire.[1] *See United States v. Eastwood,* 489 F.2d 818 (5th Cir. 1973). Under said Rule 24(a), the trial court has the power to conduct the entire examination of prospective jurors. *See United States v. Tropiano,* 418 F.2d 1069 (2d Cir. 1969); *Paschen v. United States,* 70 F.2d 491 (7th Cir. 1934); *Ungerleider v. United States,* 5 F.2d 604 (4th Cir. 1925).

Thus based on the trial court's authority as provided by HRCrP Rule 24(a) and by HRS § 635-28, prior to amendment by Act 89, SLH 1972, effective July 1, 1973, which read as follows:

> § 635-28 Challenging for cause. In all cases, civil or criminal, either party may challenge any juror drawn for the trial, for cause to be assigned to the presiding judge, *who may determine the validity of the objection urged against the competency of the juror* (emphasis added),

I am of the opinion that the trial court conducted a proper exercise of its judicial discretion when it took over appellants' counsel's voir dire of the three prospective jurors and in limiting thereafter said counsel's further voir dire of said prospective jurors.

## CONDUCT OF COURT TOWARD DEFENSE COUNSEL

Appellants have cited a number of instances in which they allege that the trial court, in the presence of the jury, unnecessarily belittled the conduct and personal competency of appellants' counsel to the prejudice of appellants' case.

In *United States v. Porter,* 441 F.2d 1204, 1213-15 (8th Cir.

---

[1] HRCrP Rule 24(a) is a copy of Rule 24(a) of the Federal Rules of Criminal Procedure with minor deviations. Thus, federal case law is helpful and appropriate.

1971), a case involving a similar factual situation where the trial court had made various remarks on the conduct of defense counsel, the court stated:

> Although on rare occasion discipline of counsel or parties may require unusual action by the court, there should always remain above all else the neutrality of the trial court manifesting to the jury no inkling of one-sidedness or bias. When comments of the trial court exceed the boundaries of fair discipline by official disparagement of counsel or of a litigant's case, then error must follow. It is charged that this happened here. We have reviewed the record and agree that many of the court's comments bordered on, and in some instances exceeded, the confines of judicial propriety. (Footnote omitted)
>
> . . . .
>
> We are fully aware that judges are human and succumb to common frailties such as impatience. But a trial judge must ever be mindful of the important role he occupies in presiding over a trial where valuable rights and liberties of the litigants are at stake. He is duty bound to exercise patience and restraint in his rulings so that the fundamental right of the parties to a fair and imparital [*sic*] trial is protected and preserved. . . .
>
> . . . .
>
> Whether or not error by reason of the court's comments is so prejudicial as to require a new trial is not resolved by a standard of facile application. The rule was stated in a similar context in Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), that error is not harmless if there is a "reasonable possibility" that the matter complained of might have contributed to the conviction. . . . Judge Johnsen of this court observed in Homan v. United States, 279 F.2d 767, 771 (8 Cir. 1960), cert. denied 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88:

> > Errors of the trial court which may be prejudicial in a close criminal case, in the sense of being capable in such a situation of possibly affecting the result, can well be without any such rational possibility in a strong case, and thus not entitle the defendant to a

reversal of his conviction. The reviewing court must, of course, be able to say with fair assurance that the errors complained of could not, with natural operation in the total setting and proceedings had, be regarded as having possessed any influencing effect.

. . . Jurors are not isolated machines which may be tested for bias by computerized analysis. They each possess human emotions, reactions and intelligence of varying degrees. Experience and study indicate, however, that the composite jury possesses far more intelligence than most judges and lawyers credit to it. The ability to fairly weigh the evidence, to discard irrelevancies, to assess equity and to ignore prejudicial comment of lawyers and judges alike is the underlying strength of the jury system. This is not to say that the improper comment will in all cases be ignored. Each record must always speak for itself. . . . (Footnote omitted.)

*See also United States v. Carrion,* 463 F.2d 704 (9th Cir. 1972).

Upon review of the record and, applying the tests stated in *Porter,* I am of the opinion that the remarks made by the trial court toward appellants' counsel in the presence of the jury, although at times unjudiciously expressed, were not prejudicial to warrant a reversal of the conviction.

### JUDGE-JURY COMMUNICATION

The appellants contend that the trial court committed reversible error by communicating with the jury without the presence of the appellants and the appellants' counsel.

The record indicates that, after the case had been submitted to the jury for deliberation, the trial court engaged in the practice of answering written questions from the jury regarding various aspects of the trial. These answers were in writing, and on at least three occasions, the trial court submitted said answers to the jury without reconvening the court, to allow the appellants and their counsel to be present and to participate in the resolution of the said answers.

The written answers of the court consisted primarily of a verbatim re-submission of prior instructions given to the jury,

and an admonition by the court as to the use of a dictionary which the court was informed was in the deliberating room.

The record further indicates that at the time the trial judge decided to submit the written responses to one set of the questions that was received from the jurors, he had the court clerk contact all of the attorneys involved in the case, to explain that they would have an opportunity to object at a later date. The objections were duly made as to each instruction and as to the said procedure followed by the court.

In *State v. Irebaria*, 55 Haw. 353, 358, 519 P.2d 1246, 1250 (1974), this court stated:

> First, all of the authorities are in accord that any response by the trial court to the jury *must be in open court with all parties and their counsel present*. (Emphasis added.)

Furthermore, HRCrP Rule 30 reads in relevant part, as follows:

> (d) Oral Comment. The court shall in no case orally qualify, modify or explain to the jury any instruction whether settled pursuant to subdivision (b) or pursuant to subdivision (c) of this rule. *If, during deliberation on its verdict the jury shall request further instructions, the court may further instruct the jury in accordance with instructions prepared by the court and reduced to writing, first submitting the same to counsel*. (Emphasis added.)

In addition, HRS § 635-43 (repealed by Act 89, SLH 1972, effective July 1, 1973) provides in relevant part:

> § 635-43 Charge to be in writing except when. Unless the parties to the cause on trial either in person or through their attorneys, file therein their written consent that the court may charge the jury orally, the court shall . . . reduce to writing and read its charge to the jury. The manuscript of the charge, signed by the court, shall be filed in the cause, and shall constitute a part of the record thereof. Whenever, and as often as the court departs from such duty, either party to the suit shall be entitled, as a matter of right, to demand and have granted a new trial of the cause.

In 1938, this court in *The Great Wilno v. Fernandez*, 34

Haw. 603, 606, in construing Sec. 3745, R.L.H. 1935, the predecessor of HRS § 635-43, stated:

We are not concerned with the wisdom of the statute. . . . The statute, by prescribing what the consequence of a departure by the court from its duty shall be, makes it mandatory [that a new trial be granted].

In my opinion HRS § 635-43 is procedural in nature and in conflict with said Rule 30. I would therefore hold that Rule 30 pre-empts HRS § 635-43.[2] And notwithstanding *Irebaria,* for the reasons expressed hereinafter concluding that though the trial court erred the error is not a reversible error, I would overrule *The Great Wilno v. Fernandez, supra.*

There is little doubt that the communications between the trial court and the jury, during deliberations by the jury, without the presence of appellants' counsel and appellants, was error. Certain jurisdictions have ruled that such a communication compels a reversal of defendant's conviction. *See Arrington v. Robertson,* 114 F.2d 821 (3d Cir. 1940); *Parfet v. Kansas City Life Insurance Co.,* 128 F.2d 361 (10th Cir. 1942), *cert. denied,* 317 U.S. 654 (1942); *Breslin v. National Surety Co.,* 114 F.2d 65 (3d Cir. 1930); *Shields v. United States,* 273 U.S. 583 (1927).

An examination of these cases reveals, however, that the communications complained of in these instances were so unquestionably prejudicial, that the courts were prompted to make broad and generalized rulings with regard to all such communications.

The more recent cases on this issue have taken a different approach. The trend is for the appellate courts to treat the error as a "harmless error"[3] if it cannot be shown that prejudice arose from the communication. *See United States v. Jackson,* 470 F.2d 684 (5th Cir. 1972); *United States v. Schor,* 418 F.2d 26 (2d Cir. 1969); *Sultan v. United States,* 249 F.2d 385 (5th Cir. 1957); *United States v. Titus,* 221 F.2d 571 (2d Cir. 1955).

---

[2] Hawaii Const. art. V, § 6.

[3] HRCrP Rule 52 reads:
(a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

I am of the opinion that the holdings in the recent cases are sound.

After a review of the record, I am of the opinion that the appellants have not been prejudiced by the trial court's *ex parte* communication with the jury. The instructions and communications alleged as error are properly drafted and constitute mainly a verbatim restatement of prior instructions.

I would therefore hold that the *ex parte* communication by the court, under the record of this case, was not a reversible error.

### BAILIFF-JUROR COMMUNICATIONS

Finally, appellants allege that they were denied a fair trial as a result of a comment made by the bailiff of the court to one of the jurors.

The record shows that the bailiff who had charge of the jury made the following comment to one of the jurors as the jury suspended their deliberation of the verdict to go to lunch: "If you would put down your knitting, you might be able to do your job."

As a result of this remark, the juror (Mrs. Baugh) sent to the court the following note:

> Message to the court. I have been accused by the bailiff of not doing my job properly. Therefore, I ask to be excused from jury duty.

The trial court denied the juror's request to be excused, and further, denied a motion by the appellants for mistrial based in part on the bailiff's remark to the juror.

Subsequent to the return of the verdict by the jury and after all the jurors had been polled affirming their verdict, the trial court excused all the jurors with the exception of juror Baugh, whom the court asked to remain.

Over appellants' objection, the court called juror Baugh to the witness stand and placed her under oath. After some preliminary questions, the court asked the following question of juror Baugh:

Q. Mrs. Baugh, the Court would like to at this time inquire whether anything that is contained — the subject matter of what is contained in this message, did it in any way prevent you from being able to continue as a fair and impartial juror in this case?

A. No. It did not.

The court then afforded each counsel, both the prosecution and the appellants, the opportunity to question the juror on his own.

In *Remmer v. United States*, 347 U.S. 227, 229 (1954), the court stated:

In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. (Citations omitted.)

In the instant case the trial court, in the presence of all the parties, conducted a proceeding to determine whether the said communication by the bailiff was harmful to appellants and concluded it was not harmful.

I am of the opinion that, though the bailiff's comment to the juror was presumptively prejudicial, the appellants' right to a fair trial was not compromised. And though *Remmer* states that the "burden rests heavily upon the Government to establish . . . that such contact . . . was harmless to the defendant" *Remmer* does not preclude the trial court from conducting its own inquiry to determine whether or not appellants were prejudiced by the bailiff's contact with the juror. And since the record on the hearing of juror Baugh shows that the appellants were not prejudiced the presumption of prejudice no longer exists, notwithstanding the initiation of the inquiry at the hearing by the trial court rather than the prosecution. I would therefore hold that the trial court's refusal

to excuse the juror and the court's denial of the motion for mistrial do not constitute reversible errors.

Thus, I would affirm.